UNITED STATES DISTRICT COURT NORTHERN
DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| L. LIN WOOD, JR., individually; | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | |
| BRAD RAFFENSPERGER, in his official | ) | |
| capacity as Secretary of State of the State | ) | |
| of Georgia; REBECCA N. SULLIVAN, | ) | |
| in her official capacity as Vice Chair of | ) | |
| the Georgia State Election Board; | ) | |
| DAVID J. WORLEY, in his official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board; MATTHEW | ) | |
| MASHBURN, in his official capacity as | ) | |
| a Member of the Georgia State Election | ) | |
| Board; and ANH LE, in her official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, | ) | |
| | ) | |
|     Defendants. | ) | |
| | ) | |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

COMES NOW Plaintiff L. LIN WOOD, JR., ("Plaintiff"), by and through the undersigned counsel, file his Verified Complaint for Declaratory and Injunctive Relief (the "Complaint"), and sue the above-captioned Defendants, respectfully showing this Honorable Court as follows:

## JURISDICTION, VENUE AND THE PARTIES

1.  This action arises under 42 U.S.C. §1983 and 1988, Articles I, II, III and IV of the United States Constitution and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over Plaintiff's claim pursuant to 28 U.S.C. §§1331 and 1343 because it involves a federal constitution question in regard to the Senatorial runoff election for the two United States Senates seats from Georgia. This Court would have supplemental jurisdiction over any State law claims pursuant to 28 U.S. C. §1367.

2.  Venue is proper under 28 U.S.C. §1391(a) because a substantial part of the events giving rise to the claim occurred or will occur in this district. Alternatively, venue is proper under 28 U.S.C §1391(b) because at least one Defendant to this action resides in this district. All Defendants reside in this State.

3.  Plaintiff L. LIN WOOD, JR. is *sui juris* and a resident of Fulton County, Georgia. He is a qualified, registered "elector" who possesses all of the qualifications for voting in the State of Georgia. Plaintiff voted in person during the Presidential Election and has or will vote in the runoff election in-person.

4.  Plaintiff has standing under Article III, section 2 of the U.S. Constitution because he has suffered an actual or imminent injury in fact. The injury is traceable to the challenged action of the Defendants. Plaintiff's injuries would be redressed

by a favorable decision in this Court. Additionally, or alternatively, the Plaintiff has standing under Article IV, section 4 of the Constitution.

5.   Defendant, BRAD RAFFENSPERGER ("SOS"), is *sui juris* and a resident of Fulton County, Georgia. Said Defendant is named in his official capacity as Secretary of State of the State of Georgia. Said Defendant is charged with the responsibility to enforce and administer election laws, including State laws affecting voting and absentee voting. Defendant is the Chair of the State Election Board. At all times material hereto, the SOS acted under color of State law.

6.   Defendants, REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE are, together with SOS, the remaining members of the State Election Board (the "SEB"), are *sui juris,* and residents of this State. Said Defendants are named in their official capacities as members of the SEB. The SEB is responsible for adopting such rules and regulations that are conducive to the fair, legal and orderly conduct of elections, but they must be consistent with and may not conflict with the state election law.

## **INTRODUCTION**

7.   Article I, section 4 of the United States Constitution provides that "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the legislature thereof; but Congress may at any

time by Law make or alter such regulations, except as to the Places of chusing Senators."

8.  In Georgia the "legislature" is the General Assembly. It is General Assembly's plenary power to set the "manner" of the upcoming senatorial runoff election.

9.  Plaintiff seeks declaratory relief and an emergency injunction halting Georgia's senatorial runoff election because the Defendants are conducting it in a "Manner" that differs from and conflicts with the election scheme established by the State Legislature, infringes on Plaintiff's fundamental right to vote and diminishes the rights of the Plaintiff to Equal Protection.

10. As a result of the Defendants' violations of the U.S. Constitution and the Georgia legislature's election scheme, the runoff election is and will proceed in an unconstitutional manner and must be cured in a constitutional manner.

11. The Georgia Legislature established a clear and efficient process for handling absentee ballots, and in particular, for resolving questions as to the identity/signatures of mail-in voters and determining how, when and where absentee ballots shall be delivered and opened. To the extent that there is any change in that process, it must, under Article I, section 4 of the Constitution, be prescribed only by the Georgia Legislature. There are four specific unconstitutional procedures challenged in this case.

**The Defendants' unlawful abrogation of the Georgia legislature's statutory mail-in absentee ballot signature verification procedure**

12. The <u>first</u> unconstitutional procedure at issue in this case involves the unlawful and improper processing of mail-in ballots. The Georgia Legislature set forth the manner for handling signature/identification verification of mail-in votes by individual county registrars and clerks. O.C.G.A. §§ 21-2-386(a)(l)(B), 21-2-380.1. Those individuals must follow a clear procedure for checking signatures to verify the identity of mail-in voters in the manner prescribed by the Georgia Legislature:

> Upon receipt of each [absentee] ballot, a registrar or clerk ***shall*** write the day and hour of the receipt of the ballot on its envelope. The registrar or clerk ***shall*** then compare the identifying information on the oath with the information on file in his or her office, ***shall*** compare the signature or make on the oath with the signature or mark on the absentee elector's voter card or the most recent update to such absentee elector's voter registration card and application for absentee ballot or a facsimile of said signature or maker taken from said card or application, and ***shall,*** if the information and signature appear to be valid and other identifying information appears to be correct, so certify by signing or initialing his or her name below the voter's oath...

O.C.G.A. § 21-2-386(a)(l)(B) (emphasis added).

13. Further, O.C.G.A. § 21-2-417 establishes an equivalent procedure for a poll worker to verify the identity of an in-person voter. One poll worker verifies the identity of in-person voters.

14. The Georgia Legislature also established a clear and efficient process to be used by a poll worker if he/she determines that an elector has failed to sign the oath on the outside envelope enclosing the mail-in absentee ballot or that the signature

does not conform with the signature on file in the registrar 's or clerk' s office (a "defective absentee ballot"). *See* O.C.G.A. § 21-2-386(a)(l)(C). With respect to defective absentee ballots:

> *If the elector has failed to sign the oath, or if the signature does not appear to be valid,* or if the elector has failed to furnish required information *or information so furnished does not conform with that on file in the registrar's or clerk's office,* or if the elector is otherwise found disqualified to vote, the registrar or clerk *shall* write across the face of the envelope "Rejected," giving the reason therefor. The board of registrars or absentee ballot clerk *shall* promptly *notify the elector of such rejection,* a copy of which notification *shall* be retained in the files of the board of registrars or absentee ballot clerk for at least one year.

O.C.G.A. § 21-2-386(a)(l )(C) (emphasis added). The Georgia Legislature clearly contemplated the use of written notification by the county registrar or clerk in notifying the elector of the rejection. This was the legislatively set *manner* of verifying voter identity for absentee mail in ballots for the elections for Federal office in Georgia, including the runoff.

15. In or about March 2020, Defendants, Secretary Raffensperger, and the State Election Board, who administer the state elections (collectively the "Administrators") entered into a "Compromise and Settlement Agreement and Release" (the "Litigation Settlement") of litigation the Democratic Party of Georgia, Inc., the Democrat Senatorial Campaign Committee, and the Democratic Congressional Campaign Committee (the "Democrat Agencies") initiated against, enacting *totally different standards to be followed a poll worker processing*

*absentee ballots in Georgia.* See *Democratic Party of Georgia, Inc., et al. v. Raffensperger, et al.*, Civil Action File No. 1:19-cv-05028-WMR, United States District Court for the Northern District of Georgia, Atlanta Division, Doc. 56-1.

16. Although the SOS is authorized to promulgate rules and regulations that are "conducive to the fair, legal, and orderly conduct of primaries and elections,"  all such rules and regulations  <u>must</u> be "consistent with law." O.C.G.A. § 21-2-31(2). Rules may not conflict with election statutes.

17. Notwithstanding, under the Litigation Settlement, the Administrators agreed to change the statutorily prescribed process of handling absentee ballots in a manner that was not consistent with the laws promulgated by the Georgia Legislature. Particularly, Litigation Settlement provides that the Secretary of State would issue an "Official Election Bulletin" to County Officials overriding the prescribed statutory procedures. The unauthorized Litigation Settlement procedure, set forth below, is more cumbersome, and conflicts with the legislative framework with respect to voter identity verification and defective absentee ballots.

18. Under the Litigation Settlement, the following language will add and has already added to the pressures and complexity of processing defective absentee ballots, making it less likely that they will be identified or, if identified, processed for rejection:

> County registrars and absentee ballot clerks *are required,* upon receipt of each mail-in absentee ballot, to compare the signature or make of

the elector on the mail-in absentee ballot envelope with the signatures or marks in eNet and on the application for the mail in absentee ballot. If the signature does not appear to be valid, registrars and clerks are required to follow the procedure set forth in O.C.G.A. § 21- 2-386(a)(l )(C). When reviewing an  elector's signature on the mail-in absentee ballot envelope, the registrar  or clerk must compare the signature on the mail-in absentee ballot envelope to each signature contained in such elector's voter registration record in eNet and the elector's signature on the application for the mail-in absentee ballot.

***If the registrar or absentee ballot clerk determines that the voter's signature on the mail-in absentee ballot envelope does not match any of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk must seek review from two other registrars, deputy registrars, or absentee ballot clerks. A mail-in absentee ballot shall  not be rejected unless a majority of the registrars, deputy  registrars, or absentee ballot clerks reviewing the signature agree that the signature does not match any of the voter's signatures on file in eNet or on the absentee ballot application. I f a determination is made that the elector's signature on the mail-in absentee ballot envelope does not match and of the voter's signatures on file in eNet or on the absentee ballot application, the registrar or absentee ballot clerk shall write the names of the three elections officials who conducted the signature review across the face of the absentee ballot envelope, which shall be in addition to writing "Rejected" and the reason for the rejection as required under 0 . C.G.A. § 21-2-386(a)(l )(C ).*** Then, the registrar or absentee ballot clerk shall commence the notification procedure set forth in O.C.G.A. § 21-2-386(a)(l)(C) and State Election Board Rule 183-1-14-.13.

19. As shown on their face, the procedures applicable to voter identification verification in connection with the actual voting process treat in-person voters like Plaintiff, different from mail-in absentee voters. Pursuant to O.C.G.A. § 21-2-417(a), an in-person voter must "present proper identification to a poll worker" before their vote may be cast. (emphasis added).

20. Similarly, the voter identification procedure provided by OCGA Section 21-2-386 provides that absentee ballots would be received and reviewed by "a registrar or clerk." See O.C.G.A. § 21-2-386(a)(1)(B). If the signature does not appear to be valid or does not conform with the signature on file, "the registrar or clerk shall write across the face of the envelope "Rejected" giving the reason therefore." See O.C.G.A § 21-2-386(a)(1)(C).

21. As such, before the Defendants entered into the unconstitutional settlement agreement, one poll worker was charged with verifying the voter's identity before their ballot was cast regardless of whether the vote was in person or by mail-in absentee ballot.

22. The Defendants thus changed the clear statutory procedure for confirming voter identity at the time of voting, so that rather than one poll worker reviewing signatures, a committee of three poll workers is charged with confirming that absentee ballot signatures are defective before rejecting a ballot.

23. Further, this new procedure treats in-person voter identification verification different from mail-in absentee voter identification verification at the time of casting the vote. By designating a committee of three to check mail-in absentee voter identification but having a single poll worker check in person voter identification, the challenged procedure favors the absentee ballots, treats the absentee voters differently from in-person voters and values absentee votes more

than the ballots of in-person voters. Indeed, when a question of voter identity arises in the runoff, one poll worker resolves it for an in-person voter, but any questions regarding mail-in absentee voter identification is resolved by three poll workers.

24. This unconstitutional change in Georgia election law made it more likely that ballots without matching signatures would be counted and had a material impact on the Defendants' final vote count, diluting Plaintiff's right to vote, to the detriment of the Republican candidates. Indeed, the Litigation Settlement led to a marked decrease in challenged signatures and the rate of rejection of absentee ballots dropped dramatically in the presidential election, and the same will occur in the United States Senate election runoff unless this Court intervenes.

25. The Settlement Agreement and Official Election Bulletin are unconstitutional and represent a usurpation of the Georgia Legislature's plenary authority to set the manner of elections. The Defendants, without legislative approval have indeed unliterally and intentionally abrogated Georgia's Statute governing the signature verification process for absentee ballots.

26. The Defendants' procedure has resulted and will result in the disparate treatment of the Plaintiff's vote and the dilution thereof, and thus, violates their constitutional rights. As a result, the procedure must be enjoined.

**The Defendants' unlawful abrogation of the Georgia Legislature's statutory prohibition on opening absentee ballots before Election Day**

27. The <u>second</u> unconstitutional procedure at issue in this case relates to the unlawful opening and/or viewing of absentee ballots (mail-in ballots) in advance of the statutory date set for such opening. As with the identity verification procedures described above, the Defendants have also usurped the Georgia General Assembly's plenary power over the manner of conducting elections by impermissibly changing the laws regarding the time for opening and/or viewing of those ballots.

28. Particularly, the Legislature promulgated O.C.G.A. §21-2-386(a)(1)(A) which provides "the board of registrars or absentee ballot clerk shall keep safely, *unopened*, and stored in a manner that will prevent tampering and unauthorized access all official absentee ballots received from absentee electors *prior to the closing of the polls on the day of the* primary or *election*." (emphasis added).

29. Pursuant to the Georgia Legislature's clear directives, "*after the opening of the polls on the day of the* primary, election, or *runoff*, the *registrars or absentee ballot clerks shall be authorized to open the outer envelope*" on a mail-in absentee ballot. *Id.* at (a)(2) (emphasis added). Additionally, "*a county election superintendent may*, in his or her discretion, after 7:00 A.M. *on the day of the* primary, election, or *runoff open the inner envelopes* in accordance with the procedures prescribed in this subsection and beginning tabulating the absentee ballots [after following certain notice procedures]." *Id.* at (a)(3). In short, mail-in

absentee ballots may not be opened before election day under the Georgia Legislative framework for federal elections.

30. Nonetheless, Defendants usurped the Legislature's power by enacting Rule 183-1-14-0.7-.15 (1). The Defendants adopted that Rule on an emergency basis on or about May 18, 2020. In direct conflict with the General Assembly's above procedures, it provides that "beginning at 8:00 a.m. *on the second Monday prior to election day, county election superintendents shall be authorized to open the outer envelope of accepted absentee ballots*, remove the contents including the absentee ballots, and scan the absentee ballots using one or more ballot scanners, in accordance with this Rule, and may continue until all accepted absentee ballots are processed." (emphasis added). This emergency rule was enacted for the June 2020 election, but was then extended on or about August 10, 2020 for use in the General Election. Thereafter, on less than 24-hour notice and with no time for meaningful public comment, the Defendants amended the rule to allow absentee ballots to be opened even earlier - three weeks before the election. This rule is in effect and is already being implemented for the January 5, 2021 senatorial runoff election.

31. This emergency rule is in direct contravention of the acts of the Georgia Legislature in its plenary power to direct the manner of the runoff election – the Legislature established its purpose for preventing early opening in the statute – to "prevent tampering and unauthorized access." The Georgia Election Code expressly

prohibits the opening of absentee ballots before election day. In contrast, the Defendants' Rule expressly allows the opening of absentee ballots three-weeks before election day. The Code and the Rule are inconsistent and mutually exclusive. The Rule must be declared invalid and stricken and/or the Defendant should be in enjoined from employing the Rule.

32. Electors will be adversely affected if mailed in ballots are opened in advance of election day.  In the November 3, 2020 election, many voters went to the polls in early voting and on election day and were told they had already voted – a fraudulent mail-in ballot had been cast in their name.  See Hearings of the Election Law Study Subcommittee of the Standing Senate Judiciary Committee, December 3, 2020, available                                                                          at https://livestream.com/accounts/26021522/events/8730585/videos/214364915.  At that point, the fraudulent votes cast in their name were already included in the pool of opened ballots, unable to be segregated and the valid elector was deprived of his or her right to vote.  This was inconsistent with the procedures mandated by the Georgia Legislature in the Election Code.

**The Defendants' unlawful installation of unauthorized ballot drop boxes are not permitted under the Georgia Legislature's election law framework**

33. The <u>third</u> unconstitutional procedure in this case involves the Defendants' establishment of an unlawful method of delivering absentee ballots to election officials.

34. The Georgia Legislature established a clear procedure for voters to deliver absentee ballots to election officials. O.C.G.A. § 21-2-382 specifies how and where absentee ballots may be delivered to county election officials. Further, O.C.G.A. § 21-2-385(a) requires electors or certain authorized representatives of electors to "personally mail or personally deliver [their absentee ballots] to the board of registrars or absentee ballot clerk."

35. These statutes, which codify a specific and detailed procedure for requesting, delivering, processing, verifying and monitoring the tabulation of absentee ballots, are designed to protect Georgians from the universally acknowledged dangers of ballot harvesting through widespread mail-in absentee voting, which carries a significant risk of election irregularities and vote fraud[1].

36. Specifically, mail-in absentee voting creates opportunities to obscure the true identities of persons fraudulently claiming to be legitimate electors and facilitates the collection of large quantities of purportedly valid absentee ballots by third-parties– commonly called "ballot harvesting" – that results in an extraordinary

---

[1] Former President Jimmy Carter and Secretary of State James A. Baker, III, Co-chairs, *Building Confidence in U.S. Elections*, COMMISSION ON FEDERAL ELECTION at p.46, *available online at* https://www.legislationline.org/download/id/1472/file/3b50795b2d0374cbef5c29766256.pdf.

increase in the number of absentee ballots received by county election officials, including many that are not received and verified in accordance with the procedure required by applicable Georgia statutes.  In fact, the Georgia Legislature set forth the very specific circumstances for returning an absentee ballot, and only authorizes those to be returned by caregivers or close family members.  O.C.G.A. §21-2-385(a).

37. In contravention of the Election Code, Defendants SOS and the SEB adopted Rule 183-1-14-0.6-.14 authorizing the use of drop boxes in order to provide, as the rule states, "a means for absentee by mail electors to deliver their ballots to the county registrars."

38. By this rule, Defendant SEB permitted and encouraged the installation and use of unattended drop boxes within Georgia's counties as a means for delivery of absentee ballots.  There is no mechanism to ensure that a person who uses a drop box meets the requirements of the Election Code.

39. SEB Rule 183-1-14-0.6-.14 claims that a drop box "shall be deemed delivery pursuant to O.C.G.A. § 21-2-385."

40. This rule's definition of delivery is in direct conflict with the language of O.C.G.A. § 21-2-385, which the Georgia General Assembly amended in 2019 specifically to prohibit ballot harvesting.

41. O.C.G.A. § 21-2-385 now specifies only two options for the submission of an absentee ballot: "the elector shall then personally mail or personally deliver the same to the board of registrars or absentee ballot clerk . . . ."

42. O.C.G.A. § 21-2-382(a) establishes the precise locations where an election official may receive an absentee ballot from the individual voter or their caregivers or family member. These sites are defined as "additional registrar's offices or places of registration."

> Any other provisions of this chapter to the contrary notwithstanding, the board of registrars may establish additional sites as additional registrar's offices or places of registration for the purpose of receiving absentee ballots under Code Section 21-2-381 and for the purpose of voting absentee ballots under Code Section 21-2-385, provided that any such site is a branch of the county courthouse, a courthouse annex, a government service center providing general government services, another government building generally accessible to the public, or a location that is used as an election day polling place, notwithstanding that such location is not a government building.

43. O.C.G.A. § 21-2-2(27) defines a "polling place" to mean "the room provided in each precinct for voting at a primary or election."

44. O.C.G.A. § 21-2-382(b) provides that in larger population areas, such as Fulton, DeKalb, Gwinnett, and Cobb counties, the following sites would automatically serve as additional receiving locations for absentee ballots:

> any branch of the county courthouse or courthouse annex established within any such county shall be an additional registrar's or absentee ballot clerk's office or place of registration for the purpose of receiving absentee ballots . . . under Code Section 21-2-385.

45. A drop box, however, is not included in the list of additional reception sites described in the exercise in O.C.G.A. § 21-2-382(a) and (b) and is not within the meaning of a "registrar's office or places of registration" in O.C.G.A. § 21-2-386.

46. A "registrar's office or places of registration" contemplates a building with staff capable of receiving absentee ballots and verifying the signature as required by the procedures prescribed in § 21-2-386.

47. A drop box cannot be deemed a location to apply for an absentee ballot "in person in the registrar's or absentee ballot clerk's office" as prescribed by § 21-2-381 nor can it be a location for an elector to appear "in person" to present the absentee ballot to the "board of registrars or absentee ballot clerk," as prescribed by § 21-2-385.

48. Pursuant to O.C.G.A. § 21-2-380.1, only the absentee ballot clerk can perform the functions or duties prescribed in the Election Code. The absentee ballot clerk "may be the county registrar or any other designated official who shall perform the duties set forth in this article."

49. Throughout the Georgia Election Code, the Legislature clearly contemplated a staffed office or building for voter registration, receipt of absentee ballot applications, and receipt of absentee ballots so that the voter can deliver the ballot "in person" or through their designated statutory agent. *E.g.,* O.C.G.A. § 21-2-385.

50. Drop boxes make it easier for political activists to conduct ballot harvesting to gather votes. When they are used there is a break in the chain of custody of those authorized by statute to collect and deliver absentee ballots, which produces opportunities for political activists to submit fraudulent absentee ballots, and the opportunity for illicit votes to be counted is significantly increased.

51. The break in the chain of custody caused by the use of drop boxes increases the chances that an absentee voter will cast his or her vote under the improper influence of another individual and enhances opportunities for ballot theft or submission of illicitly generated absentee ballots.

52. The procedures outlined above dilute the Plaintiff's fundamental right to vote, treat their vote in a disparate manner and violate their constitutional rights to Equal Protection, Due Process and the Guarantee of a Republican form of Government under the U.S. Constitution.

53. Because the Constitution reserves for State Legislatures the power to set the times, places, and manner of holding federal elections, state executive officers acting under color of law, like Defendants in this case, have no authority to unilaterally exercise that power, much less flout or ignore the Election Code, as was done in this case.

54. Georgia's Legislature has not ratified the above material changes to statutory law mandated by the Defendants.

**The Defendants' use of the unreliable and compromised
Dominion Voting Systems' hardware and software**

55. The <u>fourth</u> unconstitutional procedure in this case involves the use of Dominion

Voting Systems Corporation's ("Dominion") voting machines, including hardware and software. These machines are unreliable, compromised, problematic and subject to outside manipulation of voting results. They are going to be utilized in connection with the runoff unless this Court intervenes. "Plaintiffs are seeking relief to address a particular voting system which, as currently implemented, is allegedly recognized on a national level to be unsecure and susceptible to manipulation by advanced persistent threats through nation state or non-state actors." *Curling v. Kemp*, 344 F.Supp.3d 1303, 1318-1319 (N.D. Ga. 2018) (Totenberg).  The election software and hardware from Dominion used by the Defendants is tailor made for fraud. The Dominion systems derive from the software designed by Smartmatic Corporation.

56. Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election. Notably, Chavez "won" every election thereafter.

57. As set forth in a Dominion Whistleblower Report[2], the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic. The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government. In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.
> . . .
>
> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record of that voter's identity. Smartmatic created and operated the entire system. Whistleblower report ¶¶ 10 & 14.

58. A core requirement of the Smartmatic software design ultimately adopted by Dominion for Georgia's elections was the software's ability to hide its manipulation of votes from any audit. As the whistleblower explains:

---

[2] Reports, declarations and/or affidavits referred to herein shall be filed with the Plaintiffs' upcoming Emergency Motion for Injunctive Relief.

Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not be tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

59. The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes. First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events. Key components of the system utilize unprotected logs. Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.

60. Indeed, under the professional standards within the industry in auditing and forensic analysis, when a log is unprotected, and can be altered, it can no longer serve the purpose of an audit log. There is incontrovertible physical evidence that the standards of physical security of the voting machines and the software were

breached, and machines were connected to the internet in violation of professional standards, which violates federal election law on the preservation of evidence.

61. In deciding to award Dominion a multi-million-dollar, long term contract, and then certifying Dominion software, Georgia officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls were closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with it a screwdriver."

62. Another expert, Russell James Ramsland, Jr., has concluded that Dominion alone was responsible for the injection, or fabrication, of 289,866 illegal votes in Michigan.

63. Indeed, a forensic report dated December 13, 2020 by Allied Security Operations Group audited and tested the integrity of the Dominion Voting System performance in Antrim County, Michigan and concluded that:

"the Dominion Voting System is intentionally and purposefully designed with inherent errors to created systemic fraud and influence election

results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trial. This leads to voter or election fraud. Based on our study, we conclude that the Dominion Voting System should not be used [ ].”

The report further stated “we conclude that the errors are so significant that they call into question the integrity and legitimacy of the results in the Antrim County 2020 election to the point that the results are not certifiable. Because the same machines and software are used in 48 other counties in Michigan, **this casts doubt on the integrity of the entire election** in the state of Michigan.” Emphasis added.

64. Additionally, Garland Favorito, an information technology professional with over 40 years’ experience has presented a sworn affidavit documenting thousands of votes being flipped from President Trump to the Democratic Candidate in the November 3, 2020 election. He has concluded “it is more likely that vote-swapping malware existed on both, the Michigan and Georgia County election management servers.” And explained the necessity of forensic examination of the Dominion system in Georgia. A press release dated September 17, 2020 from VoterGa reported that “Secretary of State (SOS) **Brad Raffensperger is blocking its calls for forensic reports of faulty Dominion voting systems** in Coffee and Ware counties.” Emphasis in original.

65. These same voting machines and software are and will be implemented for use in the Georgia U.S. Senate runoff election, absent this Court’s intervention.

66. Notably, The Honorable District Court Judge Amy Totenberg issued a 174-page detailed order on October 11, 2020 that foreshadowed the dangers presented by Georgia's use of these machines. Particularly, she observed that "the substantial risks posed by Georgia's BMD system, at least as currently configured and implemented, are evident." *See Curling v. Raffensperger*, 2020 WL 5994029 *37 (N.D. Ga. October 11, 2020). Judge Totenberg went on to observe that her "Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implantation. **These risks are neither hypothetical nor remote under the current circumstances.** " Id. at *58. Emphasis added.

67. Adopting the Plaintiff's cyber security expert's testimony, Judge Totenberg observed that "this is not a question of 'might this actually ever happen?' – but 'when it will happen,' especially if further protected measures are not taken. Given the masking nature of malware and the current systems described here, if the state and Dominion simply stand by and say, 'we have never seen it,' the future does not bode well." *Id*.

68. To be sure, the use of the Dominion voting machines is known to have manipulated the election results to favor one candidate over another in contravention of the expressed will of the voters. There is actual harm imminent to the Plaintiff because these voting machines are and will be used in the runoff, thereby diluting the Plaintiff's vote.

69. Indeed, the Chairman's report of the election law study subcommittee of the Standing Senate Judiciary Committee issued a report based on   testimony from a hearing held December 3, 2020 wherein it was concluded that the "November 3, 2020 general election (the "election") was chaotic and any reported results must be viewed as untrustworthy."

70. Importantly, the presidential candidates were separated by only approximately 13,000 votes. The number of votes affected by the above constitutional violations exceeds the margin of votes dividing the presidential candidates. There is an imminent harm to the Plaintiff in that said constitutional violations will occur in the runoff election.

71. Plaintiff seeks injunctive relief including enjoining the runoff election for the two United States Senate seats from Georgia from proceeding while the unconstitutional procedures described herein are in place.

## COUNT I: EQUAL PROTECTION VIOLATION

72. The Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 71.

73. A citizen's right to vote in a State election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment to the Constitution, which prohibits a State from denying to any person within its jurisdiction the Equal Protection of the laws.

74. The Equal Protection clause prohibits States from arbitrary and disparate treatment of voters. Thus, each citizen has the constitutional right to participate in elections, including the runoff portion of any election, on an equal basis with other citizens in Georgia. The State may not value one person's vote over that of another. Treating voters differently violates the right to Equal Protection.

75. Defendants' procedures described above regarding mail-in absentee ballot voter identity verification, early opening of absentee ballots delivery of absentee ballots, illegal drop boxes, and the use of Dominion voting machines have the effect of diluting the Plaintiff's vote. This happened in connection with the 2020 Presidential Election, and unless the Court intervenes it is and will occur in the runoff.

76. As a result of the Defendants' unauthorized actions and disparate treatment of Plaintiff's vote, this Court should enter an order declaration under 28 U.S.C. §§2201(a) and 2202 and/or injunction that prohibits Defendants from utilizing in the runoff election the unconstitutional procedures set forth above. Defendants actions will diminish and dilute the weight of the lawful votes casted in the runoff election, including Plaintiff.

77. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

78. The Plaintiff has had to engage the undersigned law firm to represent him in this action and is obligated to pay same a reasonable fee.

WHEREFORE, for the foregoing reasons, the Plaintiff demands an order, preliminary and permanent injunction, and declaratory judgment in their favor and against Defendants declaring that that 2020 Senatorial runoff election procedures of the Defendants violate Plaintiff's constitutional right to equal protection; enjoining the use of said unconstitutional procedures in the runoff; declaring the runoff election procedures described herein defective and requiring Defendants to cure their violation; awarding nominal damages if applicable; granting such other relief as the Court deems just and proper; and awarding Plaintiff's attorney's fees and costs.

## COUNT II: DUE PROCESS VIOLATION

79. The Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 78.

80. The procedures utilized in the runoff election violate the Plaintiff's right to due process. The abrogation of the absentee ballot signature verification statute, of the requirement that absentee ballots not be opened before election day, the installation of unauthorized ballot drop boxes, and the use of the compromised Dominion voting machines, when considered singularly and certainly when considered collectively, render the election procedure for the runoff so defective

and unlawful as to constitute a violation of procedural due process under the Fourteenth Amendment to the Constitution.

81. The United States Supreme Court and other federal courts have repeatedly recognized that when election practices reach the point of patent and fundamental unfairness, the integrity of the election itself violates Plaintiff's substantive due process rights.

82. The Defendants unconstitutional rule making discussed above represents an intentional failure to follow election law as enacted by the Georgia Legislature. These unauthorized acts violate Plaintiff's procedural due process rights.

83. Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

84. The Plaintiff has had to engage the undersigned law firm to represent them in this action and are obligated to pay same a reasonable fee.

WHEREFORE, for the foregoing reasons, the Plaintiff demands an order, preliminary and permanent injunction, and declaratory judgment in their favor and against Defendants declaring that that 2020 Senatorial runoff election procedures of the Defendants violate Plaintiff's constitutional right to due process; enjoining the use of said unconstitutional procedures in the runoff; declaring the runoff election procedures described herein defective and requiring Defendants to cure their violation; awarding nominal damages if applicable; granting such other relief

as the Court deems just and proper; and awarding Plaintiffs attorney's fees and costs.

## COUNT III: VIOLATION OF GUARANTEE CLAUSE OF ARTICLE IV, SECTION 4 OF THE CONSTITUTION

85. The Plaintiff hereby incorporates by reference the allegations in paragraphs 1 through 84.

86. Article IV, Section 4 of the U.S. Constitution provides that "the United States shall guarantee to every State in this Union a Republican Form of Government." ("Guarantee Clause")

87. This Court and other federal courts are institutions of the United States that are constitutionally compelled to enforce the Guarantee Clause.

88. The Defendants' implementation of the above unauthorized Rules directly conflict with the Georgia Election Code; but an election system that does not provide for the certainty of a free and fair election is not providing a democratic or republican form of government.  Indeed, when State action, like the Defendants actions in this case, causes election fraud, loss and/or dilution of the fundamental right to vote, Plaintiff's complaint is elevated into a Guarantee Clause claim, mandating judicial protection of the right to vote. The Supreme Court has recognized that the right to vote is inherent in the republican form of government envisioned by the Guarantee Clause.

89. Using unreliable and comprised Dominion voting machines is contrary to the root philosophy of providing for an accountable government – the fundamental feature of a republican form of government. This this Court should not countenance any unfairness in the election rules, particularly if that unfairness is not in accordance with the will of the State Legislature. This Court should enforce the Guarantee Clause and enjoin the use of the irrational and unpredictable Dominion machines in the runoff. The Michigan Audit by allied Security Operations Group dated December 13, 2020 establishes the unreliable nature of the Dominion machines.

90. The Defendants' interference with the right to vote calls for no less than active judicial protection. When, as here, as a result of fraud and unconstitutional actions, state election procedures result in the election of illegitimate office holders, not only are voter interests diluted, but the republican form of government is undermined.

91. This Court is compelled under the circumstances of this case to invoke the guarantee clause and actively protect the Plaintiff's fundamental right to vote.

92. Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

93. The Plaintiff has had to engage the undersigned law firm to represent them in this action and are obligated to pay same a reasonable fee.

WHEREFORE, for the foregoing reasons, the Plaintiff demands an order, preliminary and permanent injunction, and declaratory judgment in their favor and against Defendants declaring that that 2020 Senatorial runoff election procedures of the Defendants violate the guarantee clause; enjoining the use of said unconstitutional procedures in the runoff; declaring the runoff election procedures described herein defective and requiring Defendants to cure their violation; awarding nominal damages if applicable; granting such other relief as the Court deems just and proper; and awarding Plaintiff's attorney's fees and costs.

## **VERIFICATION**

Pursuant to 28 U.S.C. §1746, I declare and verify under plenty of perjury that the facts contained in the foregoing Verified Complaint for Declaratory and Injunctive Relief are true and correct.

Dated: December 18, 2020

**L. LIN WOOD, JR.**
L. Lin Wood, Jr., Esq.
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. BOX 52584
Atlanta, GA 30355-0584
(404) 891-1402
lwood@linwoodlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been

electronically filed with this Court via CM/ECF and was furnished to all counsel

on the attached service list by e-mail on December 18, 2020:


L. Lin Wood, Jr., Esq.
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. BOX 52584
Atlanta, GA 30355-0584
(404) 891-1402
lwood@linwoodlaw.com
***Counsel for Plaintiff***


## SERVICE LIST[3]

CHRISTOPHER M. CARR
Deputy Attorney General
BRYAN K. WEBB
Deputy Attorney General
Russell D. Willard
Senior Assistant Attorney General
Charlene S. McGowan
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334

---

[3] The Service List is derived from the case of *Wood v. Raffensperger, et al.*, Case No. 20-cv-04651-SDG, which involved the same Defendants herein. This Service List is used in an abundance of caution to ensure that the Defendants receive immediate actual notice of this filing through their current counsel.

cmcgowan@law.ga.gov
404-458-3658 (tel)
*Attorneys for State Defendants*

Adam M. Sparks
Halsey G. Knapp, Jr.
Joyce Gist Lewis
Susan P. Coppedge
Adam M. Sparks
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*
Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com

abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Pro Hac Vice Application Pending

Counsel for Intervenor-Defendants, Democratic Party of Georgia ("DPG"),
DSCC, and DCCC ("Political Party Committees")

Bryan L. Sells
Law Office of Bryan L. Sells, LLC
P.O. Box 5493
Atlanta, GA 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com

John Powers*
jpowers@lawyerscommittee.org
Kristen Clarke
kclarke@lawyerscommittee.org
Jon M. Greenbaum*
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg*
erosenberg@lawyerscommittee.org

Julie M. Houk*
jhouk@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW

1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300

Susan Baker Manning^
Jeremy P. Blumenfeld^
Catherine North Hounfodji^
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
susan.manning@morganlewis.com
jeremy.blumenfeld@morganlewis.com
catherine.hounfodji@morganlewis.com
william.childress@moreganlewis.com
chris.miller@morganlewis.com
benjamin.hand@morganlewis.com

*admitted pro hac vice*

^ *Pro hac vice admission pending*

*Counsel for Proposed Intervenors James Woodhall, Helen Butler, Melvin Ivey, Members of the Proposed Intervenors the Georgia State Conference of the NAACP, and the Georgia Coalition for the People's Agenda*