UNITED STATES DISTRICT COURT NORTHERN
DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| L. LIN WOOD, JR., individually; | ) | |
| | ) | |
|     Plaintiff, | ) | |
| v. | ) | CIVIL ACTION FILE NO. |
| | ) | |
| BRAD RAFFENSPERGER, in his official | ) | |
| capacity as Secretary of State of the State | ) | |
| of Georgia; REBECCA N. SULLIVAN, | ) | |
| in her official capacity as Vice Chair of | ) | |
| the Georgia State Election Board; | ) | |
| DAVID J. WORLEY, in his official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board; MATTHEW | ) | |
| MASHBURN, in his official capacity as | ) | |
| a Member of the Georgia State Election | ) | |
| Board; and ANH LE, in her official | ) | |
| capacity as a Member of the Georgia | ) | |
| State Election Board, | ) | |
| | ) | |
|     Defendants. | ) | |
| _____ | ) | |

**PLAINTIFF'S EMERGENCY MOTION FOR INJUNCTIVE RELIEF AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

The Plaintiff, pursuant to the Federal Rules of Civil Procedure, including

Rule 65, and Local Rules 7.1, 7.2(B), 65, 65.1, and 65.2, moves this Court for

injunctive relief, as follows:

## I.    Statement of Facts

1.    The facts relevant to this motion are set forth in detail in the Plaintiff's Verified Complaint for Declaratory and Injunctive Relief, which is hereby incorporated by reference and will not be repeated verbatim.

2.    Additionally, the Plaintiff offers the following facts contained in the attached affidavits, declarations, and/or documentary evidence in support of this application for injunctive relief:

- Expert witness report and declaration attesting to the fact that 20,312 non-residents voted illegally. William. M. Briggs, Ph.D., a statistician, estimated based on survey data rigorously collected by Matt Braynard and the Voting Integrity Project, that 20,311 absentee or *early* voters voted in Georgia despite having moved out of state – sufficient in itself to put the outcome of the 2020 Presidential Election in doubt and demonstrate the imminent harm that will ensue if these procedures are permitted to be utilized in the runoff election. (See Briggs Declaration and Report attached hereto as Exhibit "A").

- A massive number of unrequested absentee ballots were sent in violation of the legislative scheme, estimated to a 95% confidence interval to be between 16,938 and 22,771 ballots – sufficient in itself to put the outcome of the 2020 Presidential Election in doubt and demonstrate the imminent harm that will ensue if these procedures are permitted to be utilized in the runoff election. (See Exhibit A and Expert Report of Matthew Braynard attached hereto as Exhibit "B").

- A massive number of absentee ballots were returned by the voters but never counted, estimated to a 95% confidence interval to be between 31,559 to 38,886. (See Exhibits "A" and "B").

- A declaration from Dr. Quinnell and S. Stanley Young, Ph.D., a member of the American Association for the Advancement of Science in the area of statistics, analyzed Fulton County absentee ballots and found glaring statistical anomalies that are so extreme as to be mathematically impossible to co-exist in the absentee ballot data. (See Quinnell & Young Declarations attached hereto as Exhibit "C").

- An analysis by Russell Ramsland of absentee ballot statistics showed that 5,990 absentee ballots had impossibly short intervals between the dates they were mailed out and the dates they were returned, and that at least 96,000 absentee ballots were voted but are not reflected as having been returned. (See Ramsland's Declaration attached hereto as Exhibit "D").

- The Spider Affidavit details cyber security testing and analysis, penetration testing, and network connection tracing and analysis with respect to Dominion Voting Systems servers and networks. The Affiant is formerly of the 305th Military Intelligence Battalion with substantial expertise and experience in cyber security. In testing conducted November 8, 2020, he found shocking vulnerabilities in the Dominion networks, with unencrypted passwords, network connections to IP addresses in Belgrade, Serbia, and reliable records of Dominion networks being accessed from China. Doc. 1-2, ¶¶ 7-10. The Spider affidavit also finds that Edison Research, an election reporting affiliate of Dominion, has a directly connected Iranian server, which is in turn tied to a server in the Netherlands which correlates to known Iranian use of the Netherlands as a remote server. *Id*. at ¶¶ 10-11. The Spider affidavit identifies a series of other Iranian and Chinese connections into Dominion's networks and systems. The affidavit concludes in ¶ 21:

  > In my professional opinion, this affidavit presents unambiguous evidence that Dominion Voter Systems and Edison Research have been accessible and were certainly compromised by rogue actors,

such as Iran and China. By using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, these organizations neglectfully allowed foreign adversaries to access data and intentionally provided access to their infrastructure in order to monitor and manipulate elections, including the most recent one in 2020. This represents a complete failure of their duty to provide basic cyber security. (See Spider Affidavit attached hereto as Exhibit "E").

- The Declaration of Russell Ramsland (See Exhibit "D"), finds similar shocking vulnerabilities in the Dominion networks and systems, and confirms the findings of the Spider affidavit. He further shows that malware on SCTYL's servers can capture log in credentials used in the Dominion networks. *Id*. at ¶¶ 4-5. Ramsland finds that Dominion's source code is available on the Dark Web, and that Dominions election systems use unprotected logs, making undetectable hacking by sophisticated hackers possible. *Id*. at 6-7. This latter point confirms Judge Totenberg's findings about the vulnerabilities in the Dominion system in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20).

In further analysis, Ramsland finds through sophisticated mathematical techniques that there was a distinct political bias in favor of Joe Biden and against Donald Trump in the results reported from Dominion machines vs. those reported on other systems. *Id*. at ¶¶ 8-10. Biden averaged 5% higher on Dominion and Hart systems than on other systems. *Id*. Looking at counties where Biden overperformed Ramsland's predictive model, where other machines were used Biden overperformed only 46% of the time, indicating machine neutrality. However, in the Dominion/Hart system counties, Biden overperformed the model 78% of the time, an anomalous or unnatural result to the 99.99% confidence level. *Id*. at 10-12. This analysis was confirmed by checking it by another machine learning method. *Id*. at ¶ 12. See also ¶13 ("**This indicates**

**the fraud was widespread** and impacted vote counts in a systematic method **across many machines and counties**.") (Emphasis in original). This demonstrates the imminent harm that will ensue if these procedures are permitted to be utilized in the runoff election.

In the above-mentioned affidavit, Ramsland adds the following:

Based on the foregoing, we believe this presents unambiguous evidence that using multiple statistical tools and techniques to examine if the use of voting machines manufactured by different companies affected 2020 U.S. election results, we found the use of the Dominion X/ICE BMD (Ballot Marking Device) machine, manufactured by Dominion Voting Systems, and machines from Hart InterCivic, appear to have abnormally influenced election results and **fraudulently and erroneously attributed from 13,725 to 136,908 votes to Biden in Georgia**. (Emphasis in original).
*Id*. at 11-12.

The absentee ballot signature rejection rate announced by the Secretary of State was .15%. Only 30 absentee ballot *applications* were rejected statewide for signature mismatch, with nine in tiny Hancock County, population 8,348, eight in Fulton County and *zero* in any other metropolitan county. Under the faulty consent decree, signatures could be matched (if there was any matching done at all) with the applications alone – allowing unfettered injection of bootstrapped signatures into the valid absentee ballot pool. Plaintiff alleges that these facts represent the de facto abolition of the statutory signature match requirement of O.C.G.A. § 21-2-386 in violation of state statute, the Elections and Electors Clause, and the Equal Protection and Due Process Clauses. This demonstrates the imminent harm that will ensue if these procedures are permitted to be utilized in the runoff election.

- An analysis by expert Benjamin Overholt calculates that the signature rejection rate in Georgia for absentee ballots in the 2020 election was .15%, and that the Secretary of State has used inconsistent methodologies in calculating the 2016, 2018 and 2020 rejection rates to make the 2020 rejection rate seem better by comparison. Overholt affirms that the Secretary of State's press release is "misleading" and uses inconsistent methodologies and faulty comparisons. (See Overholt Affidavit attached hereto as Exhibit "F"). This demonstrates the imminent harm that will ensue if these procedures are permitted to be utilized in the runoff election.

- The Dominion voting system ballots marked by Ballot Marking Devices are not voter-verifiable or auditable in a software-independent way. This issue has been litigated and decided against the State Defendants in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20), giving rise to issue preclusion against the Defendants on this point.

- The electronic security of the Dominion system is so lax as to present a "extreme security risk" of undetectable hacking and does not include properly auditable system logs. (See Hursti Declarations ¶¶ 37, 39, 45-48; Doc. 1-5, at p. 29, ¶ 28 attached hereto as Exhibit "G"). Judge Totenberg's decision in *Curling v. Raffensperger*, 2020 WL 5994029 (N.D. Ga. 10/11/20) also gives rise to issue preclusion on this point.

- The process of uploading data from memory cards to the Dominion servers is fraught with serious bugs, frequently fails and is a serious security risk. (See Exhibit "G" at ¶¶ 41-46).

  There has been no inventory control over USB sticks, which were regularly taken back and forth from the Dominion server to the Fulton County managers' offices, another extreme security risk. *Id*. at ¶ 47

"The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id*. at ¶ 49.

- A forensic report conducted by Russell James Ramsland Jr. dated December 13, 2020 by Allied Security Operations Group audited and tested the integrity of the Dominion Voting System performance in Antrim County, Michigan and concluded that:

  > "the Dominion Voting System is intentionally and purposefully designed with inherent errors to created systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trial. This leads to voter or election fraud. Based on our study, we conclude that the Dominion Voting System should not be used [ ]."

  The report further stated "we conclude that the errors are so significant that they call into question the integrity and legitimacy of the results in the Antrim County 2020 election to the point that the results are not certifiable. Because the same machines and software are used in 48 other counties in Michigan, **this casts doubt on the integrity of the entire election** in the state of Michigan." Emphasis added. These same voting machines and software are and will be implemented for use in the Georgia U.S. Senate runoff election, absent this Court's intervention. (See Allied Security Operations Group Report attached hereto as Exhibit "H").

- Professor Appel, Professor DeMillo, Professor Stark's article pointing to the several fatalities of the integrity of the BMDs voting system. Specifically, "ballot making devices produce ballots that do

not necessarily record the vote expressed by the voter when they enter their selections on the touchscreen: hacking, bugs, and configuration errors can cause the BMDs systems to print out votes that differ from what the voter entered and verified electronically." Andrew W. Appel, Richard A. DeMillo, Phillip B. Stark, *"Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters"* (December 27, 2019). Further, there is no assurance that a voter can express their intent by using BMDs because "[w]hen computers are used to record votes, the original transaction (the voter's expression of the votes) is not documented in a verifiable way." But elections conducted on current BMDs cannot be confirmed by audits. (See Appel, DeMillo and Stark article attached hereto as Exhibit "I").

- Professor Stark's and Professor Halderman's Declarations also point to the insecurity of BDMs, specifically noting that "BMDs, like any computers, can be hacked (by alteration of their software program to cheat); if hacked, they can systematically change votes from what the voter indicated on the touchscreen when printed on the paper ballot; few voters will notice, and those that notice have only the mitigation that they might be able to correct their own ballots, not their neighbors; and finally, recounts or audits will see only the fraudulently marked paper." (See Stark Supplemental Declaration attached hereto as Exhibit "J" and Halderman Declaration attached as Exhibit "K").

- Professor Halderman's Declaration also focusing on the how the Dominion Voting Systems BMDs expand the types and magnitude of attacks because they (needlessly) inject computer software between the voter and the expression of her vote on the ballot. (See Exhibit "K" at ¶ 39; Exhibit "J" at ¶ 30).

- Expert testimony that vote swapping malware likely existed on both the Fulton, Georgia and Antrim, Michigan election management servers. In his affidavit, Garland Favorito, an Information Technology expert who served as a monitor for the full hand count audit in Fulton and DeKalb counties prior to state certification and a subsequent recount, also outlines his observation of disparate

practices in the audits and recounts and even technical problems with the Dominion System. (See Favorito Affidavit, attached hereto as Exhibit "L").

- Press Release from VoterGA documenting that "Brad Raffensperger is blocking its calls for forensic reports of faulty Dominion Voting Systems". See press release dated September 17, 2020, attached hereto as Exhibit "M".

- News report dated December 14, 2020 reporting that "Democrats are focused on turning out new voters, including eligible Georgians who were not old enough to vote in the November election but will turn 18 by Jan. 5. Nearly 90,000 mail-in ballots have been requested by residents who did not vote in the general election." See attached news report by Hanna Miao, attached hereto as exhibit "N."

- A November 17, 2020 Official Election Bulletin showing that the office of the Georgia Secretary of State is blocking forensic reports for Faulty Dominion Systems. In this letter from the Elections Director for Georgia Secretary of State to County Election Directors, he is telling them that they would be in violation of Georgia law if they allowed forensic experts to take an image copy of their election management system so they could produce a report to help ensure the system is secure and malware free. Harvey claimed in his letter that such a protective measure "could harm election security." Georgia Secretary of State, Brad Raffensperger, has continued to protect the Dominion Systems he purchased last year from scrutiny despite numerous forensic reports being ordered in Michigan and Arizona, both of which run the same software versions used in Georgia. (See Official Election Bulletin, attached hereto as Exhibit "O").

- Report based on summary of hearing testimony from December 3, 2020 Standing Senate Judiciary Committee finding that the

November 3, 2020 General Election was "chaotic and any reported results must be viewed as untrustworthy." The Subcommittee further took notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. In their report, they outline that the testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard evidence that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the subcommittee acknowledged that Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process. The Subcommittee further noted that the history and control of the company that owns the Dominion voting system is unclear and "provides serious implications of foreign interference in the U.S. election." (See final report, attached as Exhibit "P").

3.    The above-described evidence demonstrates the failure of the Dominion Voting machine's hardware and software and the reality that the votes tallied by the Dominion system do not represent the votes as cast by the voters nor their will with regard to the results of the 2020 Presidential Election. It is clear that the runoff election is doomed to repeat this failure unless this Court intervenes. To be sure, the Plaintiff's proofs demonstrate that the output from Dominion Voting Machines are not accurate and their reported results cannot be trusted.

4.     Assuming *arguendo* this Court is not satisfied that Plaintiff has presented conclusive proof, at a very minimum, the Plaintiff has presented a *prima facie* showing that their assertions are correct, and accordingly, this Court should employ a burden shifting analysis whereby it should be the Defendants' burden to come forth with evidence satisfactory to this Court to conclusively disprove in rebut the Plaintiff's claims. *Accord* McDonnell Douglas Corp. v. Green, 93 S. Ct. 1817 (1973).

## II.     Argument

5.     Although the Plaintiff has submitted service copies of all filings in this action to counsel known to currently represent the Defendants herein, so as to afford them immediate actual notice of this matter, efforts are nonetheless underway to formally serve Defendants with process.

6.     To the extent at the time of the hearing on this emergency motion, the Defendants are deemed not to have notice, then the Plaintiff requests a temporary restraining order in accordance with Federal Rule 65(b)(1), which provides for the issuance of temporary restraining orders without notice. Based on the Verified Complaint and the affidavits and documents attached hereto, Plaintiff has shown that immediate and irreparable harm will result unless relief is afforded before the

Defendants can be heard in opposition. This is particularly so, as here every effort has been made to give the Defendants notice.

7.     If, however, at the time of this emergency hearing, it is established that the Defendants have notice and an opportunity to be heard, then the Plaintiffs request that this Court issue a preliminary injunction pursuant to Federal Rule 65(a).

8.     Because of the emergency nature of this motion and the relief requested, the Plaintiff submits that an immediate order and waiver of the usual procedures under Local Rule 7.1 is appropriate pursuant to Local Rules 65.1 and 65.2.

## A. **Plaintiff Has Standing**

9.     "A significant departure from the [State's] legislative scheme for appointing Presidential electors" or for electing members of the Federal Congress "presents a Federal Constitutional question." *Bush v. Gore*, 431 U.S. 98, 113 (2000)(Rehnquist, C.J., concurring).

10.     The Plaintiff, as holder of the fundamental right to vote has standing to seek redress when unconstitutional state actions infringe upon, dilute, or deny the right to vote. The Supreme Court recognized in *Baker v. Carr*, 82 S. Ct. 691, 703-704 (1962) that a group of qualified voters had standing to challenge the

constitutionality of a redistricting statute. An individual's "right of suffrage" is "denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) (abridgment of Equal Protection rights); see also *Crawford v. Marion Cty. Elec. Bd.*, 472 F.3d 949, 952 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008); *Fla. State Conf. of the NAACP v. Browning*, 569 F. Supp. 2d 1237, 1251 (N.D. Fla. 2008). Voters therefore have a legally cognizable interest in preventing "dilution" of their vote through improper means. *Baker v. Reg'l High Sch. Dist.*, 520 F.2d 799, 800 n.6 (2d Cir. 1975) ("It is, however, the electors whose vote is being diluted and as such their interests are quite properly before the court.") This applies to prevent votes from being cast by persons whose signatures have not been verified in the manner prescribed by the Georgia Legislature, whose ballots have been opened early, whose ballots have been dropped in unauthorized ballot boxes, and whose votes have been diluted through use of unreliable and compromised Dominion Voting System hardware and software.

11. Similarly, in *Gray v. Sanders*, 83 S. Ct. 801 (1963), the Supreme Court observed that any person whose right to vote was impaired by election procedures had standing to sue on the grounds that the system used in counting votes violated the Equal Protection Clause. Indeed, every voter's vote is entitled to be correctly

counted once and reported, and to be protected from the diluting effect of illegal ballots. *Id.* at 380. See also, *McLain v. Mier*, 851 F. 2d 1045, 1048 (8th Cir. 1988)(voter had standing to challenge constitutionality of North Dakota ballot access laws); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1333 (N.D. Ga. 2018)(individual voters whose absentee ballots were rejected on the basis of signature mismatch had standing to assert constitutional challenge to absentee voting statute).

12. The court in *Roe v. Alabama*, 43 F. 3d 574, 580, 581 (11th Cir. 1995) held that a voter sufficiently alleged the violation of a right secured by the Constitution to support a section 1983 claim based on the counting of improperly completed absentee ballots. In *Roe*, the voter and two candidates for office sought injunctive relief preventing enforcement of an Alabama circuit court order requiring that improperly completed absentee ballots be counted. The Eleventh Circuit Court stated that failing to exclude these defective absentee ballots constituted a departure from previous practice in Alabama and that counting them would dilute the votes of other voters. *Id.* 581. Recognizing that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise", the court modified but

affirmed the preliminary injunction issued by the district court in that case and enjoined the inclusion in the vote count of the defective absentee ballots. *Id.*

13. Further, in *Common Cause/Georgia v. Billups*, 554 F. 3d 1340, 1351 (11th Cir. 2009) the Eleventh Circuit held that voters had standing to challenge the requirement of presenting government issued photo identification as a condition of being allowed to vote. The plaintiff voters in that case did not have photo identification, and consequently, would be required to make a special trip to the county registrar's office that was not required of voters who had identification. *Id.* 1351. There was no impediment to the plaintiff's ability to obtain a free voter identification card. Although the burden on the Plaintiff voters was slight in having to obtain identification, the Eleventh Circuit held that a small injury, even "an identifiable trifle" was sufficient to confer them standing to challenge the election procedure. *Id*.

14. In *George v. Haslam*, 112 F. Supp. 3d 700, 709 (M.D. Tenn. 2015), registered voters were found to have standing to sue the state governor and others based on the allegation that the method by which votes cast in the election were counted violated their rights to Equal Protection. That court observed that citizens have a constitutionally protected right to participate in elections on an equal basis

with other citizens, and the equal protection clause prohibited the state from valuing one person's vote over that of another. *Id*.

15.     In *New Ga. Project v. Raffensperger*, 2020 WL 5200930 (N.D. Ga. August 31, 2020), registered voters had standing to sue the Georgia Secretary of State and the State Election Board challenging policies governing Georgia's absentee voting process in light of dangers presented by Covid-19.

16.     Further, the district court in *Middleton v. Andino*, 2020 WL 5591590 at *12 (D.S.C. September 22, 2020) ruled that a voter had standing to challenge an absentee ballot signature requirement and a requirement that absentee ballots be received on election day in order to be counted. **Notably, the court observed that the fact that an injury may be suffered by a large number of people does not by itself make that injury a non-justiciable generalized grievance**, as long as each individual suffers particularized harm, and voters who allege facts showing disadvantage to them have standing to sue. *Id*.

17.     Indeed, the voter Plaintiff has shown that as a voter, he has legal standing to maintain the challenge to the Defendants' unconstitutional procedures implemented for the January 5, 2021 Senatorial Runoff Election in Georgia. *Accord Citizens for Legislative Choice v. Miller*, 993 F. Supp. 1041, 1044-1045 (E.D. Mich. 1998)(voters who wished to vote for specific candidates in an election had standing

to challenge constitutionality of a state constitutional amendment establishing term limits for state legislators). Accordingly, Plaintiff has standing for this suit.

## B. The Standard for Relief

18.    The United States Supreme Court summarized the test for the granting of a preliminary injunction in *Winter v. NRDC, Inc.,* 555 U.S. 7, 20 (2008):

> A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.

*See also Alabama v. United States Army Corps of Eng's,* 424 F.3d 1117, 1131 (11th Cir. 2005). These are not rigid requirements to be applied by rote. "The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mold each decree to the necessities of the particular case. Flexibility rather than rigidity has distinguished it." *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 312 (1982). "[T]he granting of [a] preliminary injunction rests in the sound discretion of the district court." *Harris Corp. v. Nat'l Iranian Radio & Television,* 691 F.2d 1344, 1354 (11th Cir. 1982).

19.    "[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *University of Texas v. Camenisch,* 451 U.S. 390, 395 (1981); *Levi Strauss & Co. v. Sunrise Int'l Trading, Inc.,* 51 F.3d 982, 985 (11th Cir. 1994) (at the "preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction").

20.    Plaintiff demonstrates herein all four elements for equitable relief.  When the state legislature vests the right to vote for President in its people, the right to vote *the legislature has prescribed is fundamental;* and one source of its fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter." *Bush v. Gore,* 531 U.S. 98, 104 (2000) (emphasis added). The evidence shows that the Defendants are and will administer the runoff election for the two U.S. Senate seats from Georgia in a manner different from which was expressly prescribed by the Georgia Legislature, and also that Defendants violated Plaintiff's equal protection rights, due process rights, and the Guarantee of a Republican form of government. Unless the runoff election is halted and the Defendants are enjoined

from their ongoing constitutional violations, Plaintiff will be left with no remedy because Georgia's electoral votes for President will not be awarded to the proper candidate.

### 1. Plaintiff has a substantial likelihood of success on the merits

21. Plaintiff has made a credible showing that Defendants' intentional actions jeopardized the rights of the Plaintiff to select his leaders under the process set out by the Georgia Legislature. Defendants' conduct violated Plaintiff's constitutional rights in multiple ways as described in the Verified Complaint and herein.

22. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States,* 417 U.S. 211, 227 (1974); *see also Baker v. Carr,* 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

23. The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting*

*Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

24. Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. *See Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

**a. Defendants violated the Equal Protection Clause**

25. When deciding a constitutional challenge to state election laws, the flexible standard outlined in *Anderson v. Celebrezze,* 460 U.S. 780 (1983) and *Burdick v. Takushi,* 504 U.S. 428 (1992) applies. Under *Anderson* and *Burdick,* courts must "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party,* 520 U.S. 351, 358 (1997) (citations and quotations omitted). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of

sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee,* 915 F.3d 1312, 1318-19 (11th Cir. 2019).

26.     "To establish an undue burden on the right to vote under the *Anderson- Burdick* test, Plaintiff need not demonstrate discriminatory intent behind the signature-match scheme, or the early opening of ballots, or the use of unauthorized ballot drop boxes, or the use of the Dominion Voting machines because the Court is considering the constitutionality of a generalized burden on the fundamental right to vote, on which the Court is to apply the *Anderson-Burdick* balancing test." *Lee,* 915 F.3d at 1319.

27.     Plaintiff's equal protection claim is straightforward: states may not, by arbitrary action or other unreasonable impairment, burden a citizen's right to vote. *See Baker v. Carr,* 369 U.S. 186, 208 (1962) ("citizen's right to a vote free of arbitrary impairment by state action has been judicially recognized as a right secured by the Constitution"). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush,* 531 U.S. at 104-05. Among other things, this requires "specific rules designed to ensure uniform treatment" in order to prevent "arbitrary and disparate treatment to voters." *Id.* at 106-07; *see also Dunn v. Bloomstein,* 405 U.S. 330, 336 (1972) (providing that each citizen

"has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction").

28.    "The right to vote extends to all phases of the voting process, from being permitted to place one's vote in the ballot box to having that vote actually counted. Thus, the right to vote applies equally to the initial allocation of the franchise as well as the manner of its exercise. Once the right to vote is granted, a state may not draw distinctions between voters that are inconsistent with the guarantees of the Fourteenth Amendment's equal protection clause." *Pierce v. Allegheny County Bd. of Elections,* 324 F.Supp.2d 684, 695 (W.D. Pa. 2003) (citations and quotations omitted). "[T]reating voters differently " thus "violate[s] the Equal Protection Clause" when the disparate treatment is the result of arbitrary, ad hoc processes. *Charfauros v. Bd. of Elections,* 249 F.3d 941, 954 (9th Cir. 2001). Indeed, a "minimum requirement for non-arbitrary treatment of voters [is] necessary to secure the fundamental right [to vote]." *Bush,* 531 U.S. at 105.

29.    Defendants are not the Georgia Legislature and cannot exercise legislative power to enact rules or regulations regarding the handling of defective absentee ballots, early opening of ballots, or the delivery of ballots that are contrary to the Georgia Election Statutes. By entering the Litigation

Settlement, however, Defendants unilaterally and without authority altered the Georgia Election Code and the procedure for processing defective absentee ballots. The result is that absentee ballots have been processed differently by County Officials than the process created by the Georgia Legislature and set forth in the Georgia Election Code. Further, allowing a single political party to write rules for reviewing signatures, as paragraph 4 of the Litigation Settlement provides, is not "conducive to the fair...conduct of primaries and elections" or "consistent with law" under O.C.G.A. § 21-2-31.

30. The rules and regulations set forth in the Litigation Settlement created an arbitrary, disparate, and ad hoc process for processing defective absentee ballots, and for determining which of such ballots should be "rejected," contrary to Georgia law. This disparate treatment is not justified by, and is not necessary to promote, any substantial or compelling state interest that cannot be accomplished by other, less restrictive means.

31. For the same reasons, the Defendants are not authorized and cannot permissibly change the state constitution in order to allow voters who were not eligible to vote in the 2020 Presidential Election to vote in the upcoming runoff. They also may not change the law relative to the opening and delivery of absentee ballots. Georgia statues prohibit opening absentee ballots before Election Day.

Defendants' unauthorized rule changed the law by providing for absentee ballots to be opened three weeks before Election Day. The statute and the rule are an irreconcilable conflict.

32. Additionally, Georgia State Law does not authorize the use of unattended drop boxes for the delivery of absentee ballots to election officials. The Defendants' rule illegally establishes and implements the use of exactly such ballot drop boxes. Again, the rule is irreconcilable with the statute. Under these circumstances, the rule must yield to the statue or be stricken. The Defendants are not permitted under the Constitution to change State Law. As such, there is a substantial likelihood that Plaintiff will be successful in demonstrating that he has been harmed by Defendants' violations of their equal protection rights, and an injunction should be issued to halt the runoff election and require Defendants to cure their violations in a constitutional manner.

**b. The Defendants Violated the Due Process Clause**

33. The procedures utilized in the runoff election as described in the Verified Complaint violate the Plaintiff's right to due process. The abrogation of the absentee ballot signature verification statute, of the requirement that absentee ballots not be opened before election day, the installation of unauthorized ballot drop boxes, and the use of the compromised Dominion voting machines, when

considered singularly and certainly when considered collectively, render the election procedures for the runoff so defective and unlawful as to constitute a violation of Plaintiff's right to procedural due process under the Fourteenth Amendment to the Constitution.

34.    The United States Supreme Court and other federal courts have repeatedly recognized that when election practices reach the point of patent and fundamental unfairness, the integrity of the election itself violates Plaintiff's substantive due process right. *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978); *Duncan v. Poythress*, 657 F.2d 691, 702 (5th Cir. 1981); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1183-84 (11th Cir. 2008); *Roe v. State of Ala. By & Through Evans*, 43 F.3d 574, 580-82 (11th Cir. 1995*); Roe v. State of Ala*., 68 F.3d 404, 407 (11th Cir. 1995); *Marks v. Stinson*, 19 F. 3d 873, 878 (3rd Cir. 1994).

35.    The Defendants' unconstitutional rule making discussed above represents an intentional failure to follow election law as enacted by the Georgia legislature. These unauthorized acts violate Plaintiff's procedural due process rights. *Parratt v. Taylor*, 451 U.S. 527, 537-41 (1981), overruled in part on other grounds by *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Hudson v. Palmer*, 468 U.S. 517, 532 (1984).

**c. Defendants Violated the Guarantee Clause**

36.     The Constitution provides that "the United States shall guarantee to every State in this Union a Republican Form of Government." *See* Article IV, § 4, United States Constitution.

37.     This Court and other federal courts are institutions of the United States that are constitutionally compelled to enforce this guarantee. Indeed, the Supreme Court has recognized that not all claims under the Guarantee clause present nonjusticiable political questions, and the courts should address the merits of such claims, at least in some circumstances. See *New York v. United States*, 112 S. Ct. 2408, 2432- 2433. This case merits the Court's invocation of the Guarantee clause.

38.     The Defendants' implementation of the above unauthorized Rules that directly conflict with the Georgia election statutory scheme, in and of themselves, or certainly in combination with the use of the unreliable and comprised Dominion voting machines is so contrary to the root philosophy of a Republican form of government that this Court should enforce the guarantee clause and enjoin their use in the runoff. *Mountain States Legal Foundation v. Denver School District #1*, 459 F. Supp. 357, 361 (D. Colo. 1978).

39.     Indeed, when State action, like the Defendants actions in this case, causes election fraud, loss and/or dilution of the fundamental right to vote,

Plaintiff's Complaint is elevated into an Article IV, section 4 claim, mandating judicial protection of the right to vote. The Supreme Court has recognized that the right to vote is inherent in the republican form of government envisioned by the Guarantee clause. *Baker v. Carr*, 369 U.S. 186, 242 (1962).

40.     The Defendants' interference with the right to vote calls for no less than active judicial protection. When, as here, as a result of fraud and unconstitutional actions, state election procedures result in the election of illegitimate office holders, not only are voter interests diluted, but the republican form of government is undermined.

41.     This Court is compelled under the circumstances of this case to invoke the guarantee clause and actively protect the Plaintiff's fundamental right to vote.

42.     Plaintiff has no adequate remedy at law and will suffer serious and irreparable harm unless the relief requested herein is granted.

### 2. Plaintiff will suffer irreparable harm

43.     The irreparable nature of the harm to Plaintiff is apparent. "It is well-settled that an infringement on the fundamental right to vote amounts in an irreparable injury." *L. Rod v. Burns*, 427 U.S. 347, 373 (1976)(plurality opinion); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018)(a violation of the right to vote cannot be undone through monetary relief, and thus, the

violation of the right to vote amounts to irreparable harm.) *New Ga. Project v. Raffensperger,* 2020 WL 5200930, at *26 (N.D. Ga. Aug. 31, 2020)(where plaintiff has alleged her fundamental right to vote has been infringed, irreparable injury is generally presumed). If the runoff election is not halted and the unconstitutional procedures are not enjoined, the Plaintiff's right to vote will be infringed upon, burdened, or denied. The results of the runoff election, if the unconstitutional procedures are allowed to stand, will be improper. There is no adequate remedy at law if this transpires. As such, this Court should issue the requested injunction.

### 3. The Balance of Harms and Public Interest

44.     The remaining two factors for the preliminary injunction test, "harm to the opposing party and weighing the public interest merge when the Government is the opposing party." *New Ga. Project,* 2020 WL 5200930, at *26 *(quoting Nken v. Holder,* 556 U.S. 418, 435 (2009)) (alterations and punctuation omitted).

45.     Plaintiff (and the citizens of Georgia) may lose the opportunity for meaningful relief entirely if runoff election is not halted, and the constitutional violations cured because there may be no remedies that would remain after that point. *New Ga. Project, 2020 WL 5200930, at *26* (concluding that movant

satisfied balance of harms/public interest factors, as "Plaintiffs will be forever harmed if they are unconstitutionally deprived of their right to vote"). The high level of harm to the Plaintiff and comparatively low costs to the Defendants make this a case with substantial net harm to Plaintiff an injunction can prevent. *See Reilly v. City of Harrisburg,* 858 F.3d 173, 179 (3d Cir. 2017).

46.    Moreover, the public will be served by this injunction. "[T]he public has a strong interest in exercising the fundamental political right to vote. That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful. The public interest therefore favors permitting as many qualified voters to vote as possible," and having those votes properly processed and tallied pursuant to Georgia law-not pursuant to the Defendant's unconstitutional rule making. *Obama for Am. v. Husted,* 697 F. 3d 423, 436-37 (6th Cir. 2012) (citations and quotations omitted).

WHEREFORE, Plaintiff prays that this Court enter an emergency temporary restraining order and/or preliminary injunction as follows:

1. Declaring that that 2020 Senatorial runoff election procedures of the Defendants violate Plaintiff constitutional rights to equal protection, due process, and the guarantee to a Republican form of government enjoining the use of said unconstitutional procedures in the runoff;

2. Declaring the runoff election procedures described herein defective and requiring Defendants to cure their violation; *and*

3. Granting such other relief as the Court deems just and proper, including without limitation ordering Plaintiff to have access to the absentee ballot mail-in envelopes received and/or processed so far in the Senatorial Runoff Election and allowing them to view and verify the signatures against those on file.

Dated: December 18, 2020

/s/ L. Lin Wood
**L. LIN WOOD, JR.**
L. Lin Wood, Jr., Esq.
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. BOX 52584
Atlanta, GA 30355-0584
(404) 891-1402
lwood@linwoodlaw.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing has been electronically filed with this Court via CM/ECF and was furnished to all counsel on the attached service list by e-mail on December 18, 2020:

/s/ L. Lin Wood
L. Lin Wood, Jr., Esq.
GA Bar No. 774588
L. LIN WOOD, P.C.
P.O. BOX 52584
Atlanta, GA 30355-0584
(404) 891-1402
lwood@linwoodlaw.com
***Counsel for Plaintiff***

# <u>SERVICE LIST</u>[1]

CHRISTOPHER M. CARR
Deputy Attorney General
BRYAN K. WEBB
Deputy Attorney General
Russell D. Willard
Senior Assistant Attorney General
Charlene S. McGowan
Assistant Attorney General
40 Capitol Square SW
Atlanta, GA 30334
cmcgowan@law.ga.gov
404-458-3658 (tel)
*Attorneys for State Defendants*

Adam M. Sparks
Halsey G. Knapp, Jr.
Joyce Gist Lewis
Susan P. Coppedge
Adam M. Sparks
KREVOLIN AND HORST, LLC
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
coppedge@khlawfirm.com
sparks@khlawfirm.com

---

[1] The Service List is derived from the case of *Wood v. Raffensperger, et al.*, Case No. 20-cv-04651-SDG, which involved the same Defendants herein. This Service List is used in an abundance of caution to ensure that the Defendants receive immediate actual notice of this filing through their current counsel.

Marc E. Elias*
Amanda R. Callais*
Alexi M. Velez*
Emily R. Brailey*
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone: (202) 654-6200
melias@perkinscoie.com
acallais@perkinscoie.com
avelez@perkinscoie.com
ebrailey@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, Washington 98101
Telephone: (206) 359-8000
khamilton@perkinscoie.com
abeane@perkinscoie.com

Gillian C. Kuhlmann*
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067
Telephone: (310) 788-3900
gkuhlmann@perkinscoie.com

Matthew J. Mertens*
Georgia Bar No: 870320
PERKINS COIE LLP
1120 NW Couch Street, 10th Floor
Portland, Oregon 97209
Telephone: (503) 727-2000

*Pro Hac Vice Application Pending

*Counsel for Intervenor-Defendants, Democratic Party of Georgia ("DPG"), DSCC, and DCCC ("Political Party Committees")*

Bryan L. Sells
Law Office of Bryan L. Sells, LLC
P.O. Box 5493
Atlanta, GA 31107-0493
(404) 480-4212 (voice/fax)
bryan@bryansellslaw.com

John Powers*
jpowers@lawyerscommittee.org
Kristen Clarke
kclarke@lawyerscommittee.org
Jon M. Greenbaum*
jgreenbaum@lawyerscommittee.org
Ezra D. Rosenberg*
erosenberg@lawyerscommittee.org

Julie M. Houk*
jhouk@lawyerscommittee.org
LAWYERS' COMMITTEE FOR CIVIL RIGHTS UNDER LAW
1500 K Street NW, Suite 900
Washington, DC 20005
Telephone: (202) 662-8300

Susan Baker Manning^
Jeremy P. Blumenfeld^
Catherine North Hounfodji^
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
Telephone: +1.202.739.3000
Facsimile: +1.202.739.3001
susan.manning@morganlewis.com
jeremy.blumenfeld@morganlewis.com
catherine.hounfodji@morganlewis.com
william.childress@moreganlewis.com
chris.miller@morganlewis.com
benjamin.hand@morganlewis.com

*admitted pro hac vice*

*^ Pro hac vice admission pending*

*Counsel for Proposed Intervenors James Woodhall, Helen Butler, Melvin Ivey, Members of the Proposed Intervenors the Georgia State Conference of the NAACP, and the Georgia Coalition for the People's Agenda*