# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

L. LIN WOOD, JR.,

    *Plaintiff,*

    v.

BRAD RAFFENSPERGER, in his
    official capacity as Secretary of
    State of Georgia, *et al.*,

    *Defendants.*

CIVIL ACTION

FILE NO. 1:20-cv-05155-TCB

---

## DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................. 1

STATEMENT OF FACTS AND STATUTORY BACKGROUND ...................... 2

    A. Signature verification conducted by county officials. ......................... 2

    B. Counties' acceptance and processing of absentee ballots. .................. 4

    C. The State's electronic voting system..................................................... 5

ARGUMENT AND CITATION TO AUTHORITY ............................................. 9

    I.    Plaintiff's Complaint must be dismissed since this Court lacks subject matter jurisdiction, equitable considerations bar the claims, and, in any event, Plaintiff has failed to state a claim............................................... 9

    A. This Court lacks Subject Matter Jurisdiction and must dismiss Plaintiff's Complaint for lack of standing. ........................................... 9

        i.   Plaintiff has not alleged an injury in fact sufficient to confer standing................................................................................... 10

        ii. Plaintiff's claims are not fairly traceable to the State Defendants and cannot be redressed by relief entered against them............. 12

    B. Plaintiff's claims are barred by the Eleventh Amendment. ............. 15

    C. The prior pending action doctrine and the doctrine of laches bar Plaintiff's claims. .............................................................................. 17

    D. Plaintiff's Guarantee Clause claim presents a non-justiciable political question and must be dismissed.......................................... 19

    E. Even if Plaintiff's claims are not otherwise barred, Plaintiff has failed to state a claim for which relief can be granted and has not perfected service of process. ............................................................. 20

    II.   Plaintiff's Motion for preliminary injunctive relief must be denied ..... 22

A. Even if Plaintiff's claims are properly before this Court, they are not likely to succeed on the merits. ........................................................... 23

    i. Equal Protection (Count I) ........................................................... 23

    ii. Due Process (Count II) ................................................................. 25

    iii. Guarantee Clause (Count III) ...................................................... 26

B. Plaintiff has failed to show irreparable harm. ................................. 27

C. The balance of the equities and public interest weighs decidedly against granting injunctive relief. .................................................... 29

CONCLUSION ................................................................................................ 30

**INTRODUCTION**

Plaintiff L. Lin Wood, Jr., having been unsuccessful in other prior cases as both a plaintiff and counsel, now asks this Court to do what others have already told him they would not. *See Wood v. Raffensperger*, No. 1:20-CV-6817513, 2020 WL 6817513 (N.D. Ga. Nov. 20, 2020) ("*Wood I*"), *aff'd* No. 20-14418, 2020 WL 7094866 (11th Cir. Dec. 5, 2020) ("*Wood II*"); *see also Pearson v. Kemp*, No. 1:20-cv-04809-TCB (N.D. Ga.). While Mr. Wood encourages other Georgians not to vote in elections because Hugo Chavez has predetermined the outcome and outside political observers wonder whether voters will heed his directive, Wood seeks to remove all speculation—by having this Court halt the ongoing election less than two weeks before election day and in the midst of early voting.

To support his claims, Wood recycles various exhibits this Court has previously seen and others have found unconvincing, and alleges violations of *State* law, all without clearly establishing what precise injury he could possibly be forced to incur. His claims, however, are barred as a matter of law and this Court does not enjoy jurisdiction to entertain them. But even if they weren't, Wood cannot meet his heavy burden to obtain interlocutory relief. For the reasons that follow, this Court should dismiss Wood's Complaint and

1

deny his motion for interlocutory relief—allowing Georgians to elect their Senators as the Constitution provides.

## STATEMENT OF FACTS AND STATUTORY BACKGROUND

Plaintiffs bases his claims on four different practices regarding the January Runoff Election: (1) Signature verification pursuant to O.C.G.A. § 21-2-386; (2) Counties acceptance of absentee ballots by drop box pursuant to O.C.G.A. § 21-2-382 and Ga. Comp. R. & Regs. r. 183-1-14-.09-.14; (3) Counties' processing of absentee ballots pursuant to O.C.G.A. § 21-2-386 and Ga. Comp. R. & Regs r. 183-1-14-.09-.15; and (4) use of the State's Ballot-Marking Device ("BMD") voting system. *See generally* [Doc. 1]. Plaintiffs' mischaracterization of those processes demonstrates either ignorance or a misunderstanding of the law, and requires correction here.

A. Signature verification conducted by county officials.

This Court is familiar with the facts and law regarding Georgia's signature verification process, having seen briefing on the matter only a couple weeks ago in *Pearson v. Kemp*. Nonetheless, absentee ballots for the 2020 general election were processed by county election officials according to the procedures established by the Georgia legislature. Recent legislation, House Bill 316 (2019), provided for a "cure" provision in the event signatures reviewed by local election officials do not match, giving a voter three days to

2

correct the deficiency. *See* O.C.G.A. § 21-2-386(a)(1)(C). Prior to the enactment of this cure provision, election officials were required to "promptly notify" the voter of a rejected absentee ballot due to a missing or mismatched signature and that prompt notification requirement remains.

Subsequently, and while litigation was pending against the State, the State Election Board approved a rule establishing a uniform standard of the prompt notification requirement which delineates the contours of "promptly notify." Ga. Comp. R. & Regs. r. 183-1-14-.13 (notice of the rejection and opportunity to cure within three business days, or by next business day if within ten days of Election Day). Because the Prompt Notification Rule resolved the issues in the pending lawsuit, the parties resolved the matter in a settlement agreement that included, among other terms, an agreement involving the Secretary's issuance of guidance to county election officials regarding the signature matching process (an "Official Election Bulletin" or "OEB"). In essence, the challenged Settlement Agreement/OEB, merely requires "an additional safeguard to ensure election security by having more than one individual review an absentee ballot's information and signature for accuracy before the ballot is rejected." *Wood I* at \*10. No statute cited by the Plaintiffs maintains that only one county official examine the absentee ballot,

3

and that the review process involves several officials does not make it any less rigorous or inconsistent with the statutory law.

  B. Counties' acceptance and processing of absentee ballots.

Similar to the signature verification process, acceptance of absentee ballots by drop box and processing or scanning of those ballots takes place at the county level. Indeed, it is *county* registrars or absentee ballot clerks that compare the signature on the ballot envelope with others on file, O.C.G.A. § 21-2-386, those same *county* officials then open and scan those ballots, *id.*, and *county* boards of registrars *may* establish additional sites for the purpose of receiving and voting absentee ballots, O.C.G.A. § 21-2-382.

Plaintiff complains of a State Election Board rule permitting the processing of absentee ballots before election day, Ga. Comp. R. & Regs. 183-1-14-.09-.15, but this rule is also a reasonable exercise of the State Defendants' authority (and this determination is also barred by the Eleventh Amendment). A similar analysis applies to the Emergency Drop Box Rule (and which this Court also must not reach as required by the Eleventh Amendment). Ga. Comp. R. & Regs. 183-1-1-.08.-.14. Existing law permits counties to establish additional locations to receive absentee ballots at various specific locations or other government properties. O.C.G.A. § 21-2-382. Plaintiff ignores this statute altogether, and the legal reality that *county*

4

boards hold the authority to establish additional locations for receiving absentee ballots is fatal to his claims regard drop boxes.[1]

C. <u>The State's electronic voting system.</u>

In 2019, the General Assembly adopted a new uniform system of voting throughout the State—moving the State away from the secure, but older, direct-recording electronic ("DRE") voting system to a voting system utilizing BMDs and optical scanners. House Bill 316, Act 24 (2019). The General Assembly determined this replacement of DREs with BMDs should occur "as soon as possible." O.C.G.A. § 21-2-300(a)(2). In this system, the BMD allows the voter to make selections on a screen and then prints those selections onto a paper ballot. The voter has an opportunity to review the paper ballot before placing it into the scanner (which actually tabulates the votes). After scanning, the paper ballot drops into a locked ballot box connected to the scanner. BMDs thus create an auditable, verifiable ballot, as required by statute. O.C.G.A. § 21-2-300(a)(2).

---

[1] In any event, contrary to Plaintiff's theory, drop boxes are actually **more secure** than mailboxes. A drop box must be placed in an area that has (1) adequate lighting; (2) uses a video recording device to "monitor each drop box location;" (3) the videos must be retained by county registrars for at least 30 days or until the end of an election contest. Ga. Comp. R. & Regs. 183-1-.08-.14(4) and (5).

Georgia's voting system is subject to two different certification requirements. First, the voting system must have been certified by the United States Election Assistance Commission ("EAC") at the time of procurement.[2] O.C.G.A. § 21-2-300(a)(3). Second, the voting system must also be certified by the Secretary of State as safe and practicable for use. Georgia's BMD system meets both requirements. Those certifications are conducted by independent Voting System Test Laboratories ("VSTL"). In the case of the voting system utilized in Georgia, SLI Compliance served as the VSTL tasked with testing the system for EAC purposes. The system utilized by Georgia, Democracy Suite 5.5-A was certified by the EAC on January 30, 2019.[3] Separately, the Secretary of State utilized another independent EAC-certified VSTL to conduct testing for State certification of the voting system, Pro V&V, and certified it in August 2019.[4]

_____

[2] The Help America Vote Act ("HAVA") created the EAC, which set up a rigorous process for voting-equipment certification, working with committees of experts and coordinating with the National Institute of Standards and Technology. 52 U.S.C. § 20962; see also 52 U.S.C. §§ 20962, 20971 (test lab standards).

[3] *See* United States Election Assistance Commission, Agency Decision — Grant of Certification, https://www.eac.gov/sites/default/files/voting_system/files/Decision.Authority.Grant.of.Cert.D-Suite5.5-A.pdf

[4] https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf

Not only have two separate EAC-Certified independent VSTLs confirmed the system operates as intended, but Georgia's risk-limiting audit ("RLA") further confirms no "misallocation, redistribution, or deletion of votes" occurred. [Doc. 1 at ¶ 59]. Following the counties' tabulation of the November election results, but prior to certification, Secretary Raffensperger was required by law to designate a race to subject to a risk-limiting audit in accordance with O.C.G.A. § 21-2-498. *See also* Ga. Comp. R. & Regs. r. 183-1-15-.04. Recognizing the importance of clear and reliable results for such an important contest, Secretary Raffensperger selected the presidential race for the audit. *See* Exhibit A.

County election officials were then required to count by hand **all** absentee ballots and paper ballots printed by the Dominion BMDs. *See id*. The audit confirmed the same outcome of the presidential race as the original tabulation using the Dominion voting systems equipment. *Id.* While there was a slight differential between the audit results and the original machine counts, the differential was well within the expected margin of error that occurs when hand-counting ballots. *Id.* A 2012 study by Rice University and Clemson University found that hand counting ballots in post-election audit or recount procedures can result in error rates of up to 2 percent. *Id.* In Georgia's audit, the highest error rate reported in any county recount was

0.73%, and most counties found no change in their final tally. *Id.* The audit results refute Plaintiffs' speculation that Dominion machines or software might have somehow flipped votes in the 2020 presidential election.

To dispute these facts, Plaintiffs offer statistical analysis of Russell Ramsland, another affidavit from "Spider" which contains seven paragraphs of non-substantive information duplicated twice, disputed evidentiary filings from the case *Curling v. Raffensperger*, 1:17-cv-2989-AT (N.D. Ga.), an analysis of *another state's* voting system without indication it is the same as that used in Georgia, and various claims and allegations about another voting system vendor entirely. But this Court need not rely on these analyses—the RLA which expanded to a full hand count provides far better data than statistical assumptions and definitively refutes Plaintiff's claims.[5] And as for the *Curling* case, that litigation has been subject to nine different preliminary injunction motions while at no point ever alleging any compromise of the system. Further, the *Curling* order Plaintiff cites in his Complaint, [Doc. 1 at ¶ 55], actually concerns the State's *old* DRE system.

---

[5] Nor should this Court give any credence to the Spider affidavit (even if it did assert substantive information. The Spider is apparently no military technology expert at all. *See* Brown, Davis, and Crites, *Sidney Powell's secret 'military intelligence expert,' key to fraud claims in election lawsuits, never worked in military intelligence*, Washington Post (Dec. 11, 2020), https://www.washingtonpost.com/investigations/sidney-powell-spider-spyder-witness/2020/12/11/0cd567e6-3b2a-11eb-98c4-25dc9f4987e8_story.html.

*See Curling v. Kemp*, 344 F. Supp. 3d 1303, 1308 (N.D. Ga. 2018). And the most-recent orders in *Curling* are now subject to two different appeals in the Eleventh Circuit, with the Court granting a stay as to one. Docket Nos. 20-13730 and 20-14067.

### ARGUMENT AND CITATION TO AUTHORITY

**I. Plaintiff's Complaint must be dismissed since this Court lacks subject matter jurisdiction, equitable considerations bar the claims, and, in any event, Plaintiff has failed to state a claim.**

A. This Court lacks Subject Matter Jurisdiction and must dismiss Plaintiff's Complaint for lack of standing.

Jurisdiction of the Federal judiciary is limited to only active "cases" and "controversies." U.S. Const. art. III, § 2. To satisfy that Constitutional limitation, "the person seeking to invoke the jurisdiction of the court must establish standing to sue" before the court reaches the merits of a legal claim, *Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990), requiring the litigant prove: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiff cannot meet this jurisdictional burden—asserting only generalized grievances while asking this Court to issue an advisory opinion on Georgia law, and seeking to enjoin

9

actions traceable to and redressable by an order against non-party county election officials.

i.  *Plaintiff has not alleged an injury in fact sufficient to confer standing.*

"To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1548 (2016) (citing *Lujan*, 504 U.S. at 560). As to particularity, the alleged injury must "affect the plaintiff in a personal and individual way," *id.* at 1548, "[a] generalized grievance [that] is undifferentiated and common to all members of the public" will not suffice. *Wood II* at *4.

For his part, Mr. Wood alleges that he is a qualified, registered elector who "has or will vote in the runoff election in-person,"[6] [Doc. 1 at ¶ 3], goes on to blithely allege "he has suffered an actual or imminent injury in fact" (curiously avoiding any allegation that the injury is particularized to him), *id.*

---

[6] Curiously, this allegation is in contradiction with public statements of Mr. Wood in which he has repeatedly stated he will *not* vote on Georgia's BMDs in the upcoming Runoff Elections. *See, e.g.*, Alana Wise, *Trump Allies Discourage Georgia Residents from Voting in January Runoff*, National Public Radio (Dec. 2, 2020), https://www.npr.org/sections/biden-transition-updates/2020/12/02/941632178/trump-allies-discourage-georgia-residents-from-voting-in-january-runoff.

at ¶ 4, and elsewhere states in conclusory fashion that his vote will be diluted or disparately treated due to the use of the State's voting machines and alleged violations of the law, *see, e.g., id.* at ¶¶ 26, 52, 68, 75. But Mr. Wood uniquely knows these allegations are insufficient to confer standing: earlier this month the 11th Circuit affirmed the dismissal of another suit he brought in this District, finding that his alleged injury would affect him "in the same way as every other Georgia voter." *Wood II* at *5. Similarly, this Court in *Pearson v. Kemp*, No. 1:20-cv-04809-TCB—a case in which Mr. Wood was counsel of record for the plaintiffs—also found that plaintiffs' generalized grievances regarding the State's voting machines did not confer standing, noting:

> [T]he Plaintiffs don't have standing, because anyone could have brought this suit and raised the exact same arguments and made the exact same allegations that the Plaintiffs have made in their complaint. The Plaintiffs have essentially alleged in their pleading that their interests are one and the same as any Georgia voter.

Exhibit B, Tr. 42:16–43:1.

At minimum, Plaintiff has failed to show how *he* is particularly injured by an absentee voting process he is determined not to use. Indeed, any challenged absentee process could not have injured (and will not injure in the future) Wood, as it was admitted and determined in *Wood I*, and alleged in

11

Plaintiff's Complaint here ([Doc. 1 at ¶ 3]), that Mr. Wood did not vote by absentee ballot in the November Election, *Wood I* at \*9, and will not now.

In sum, just as in *Pearson* and *Wood*, Plaintiff's purported injury here "is precisely the kind of undifferentiated, generalized grievance that the Supreme Court has warned must not be countenanced." *Wood II* at \* 5 (quoting *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324 (11th Cir. 2007)) (internal marks omitted).[7]

> ii. *Plaintiff's claims are not fairly traceable to the State Defendants and cannot be redressed by relief entered against them.*

As the Eleventh Circuit held in *Jacobson*, "[t]o satisfy the causation requirement of standing, a plaintiff's injury must be 'fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court.'" *Jacobson*, 974 F.3d at 1253 (quoting *Lujan*, 504 U.S. at 560). Further, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.*,

---

[7] This holding provides another, alternative basis to conclude Wood lacks standing at least as to his Equal Protection claim—collateral estoppel. *See N. Ga. Elec. Membership Corp. v. City of Calhoun, Ga.*, 989 F.2d 429, 432–33 (11th Cir. 1993) (holding that dismissal for lack of jurisdiction "adjudicate[s] the court's jurisdiction, and a second complaint cannot command consideration of the same jurisdictional claims") (citations and internal marks omitted).

12

944 F.3d 1287, 1301 (11th Cir. 2019) (internal quotations omitted). Here, just as in *Jacobson* and *Lewis*, Plaintiff cannot meet Article III's traceability and redressability requirements.

As to all of the absentee ballot practices, those responsibilities fall within the purview of non-party county election officials—not the State Defendants. Accordingly, it is those *county* officials to whom Plaintiff's purported injury is traceable to and redressable against, but those county officials are not before this Court. Put another way, while this Court may "enjoin executive officials from taking steps to enforce a statute," it can "exercise that power only when the officials who enforce the challenged statute are properly made parties to a suit," which is not the case here. *Jacobson*, 974 F.3d at 1254.

Just two days ago, in *Georgia Republican Party, Inc. v. Georgia Secretary of State*, a motions panel of the Eleventh Circuit applied *Jacobson* in the context of Georgia law and found that the plaintiffs-appellants had not met Article III's traceability and redressability requirements on nearly identical claims. 2020 WL 7488181 (11th Cir. Dec. 21, 2020). Plaintiff-appellants there asserted claims of undue burden on the right to vote under the First and Fourteenth Amendments on a theory that the signature verification scheme dilutes valid votes, that arbitrary application of the

13

signature verification law violates due process under the Fourteenth Amendment, and that inconsistent application of the law violates equal protection. *Id.* at *1. But the Eleventh Circuit denied their motion to stay, finding that since "the law gives the authority to conduct the signature-verification process to local supervisors, not the Secretary," the alleged injury "is not traceable to the Secretary. And the Secretary does not have authority to redress it." *Id.* at *2.

Nor are Plaintiffs' outlandish allegations about the State's voting machines sufficient to carry their burden to establish standing since their allegations of injury are also traceable to nonparties—namely, Hugo Chavez, and/or the Iranian, Russian, or Chinese governments. In this instance, it is the independent action of third-party dictators who purportedly have injured the Plaintiff—such is insufficient to establish traceability to the State. *See Lujan*, 504 U.S. at 560–61 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Moreover, even if this Court were to enjoin the State Defendants from utilizing the BMDs, such an injunction would do nothing to prevent non-party counties from utilizing them or otherwise employing some other system which Plaintiff believes has also been rigged by non-party despots—while the State provides BMDs to county officials, O.C.G.A. § 21-2-300(a)(3), those county officials may purchase their own equipment, *id.*, and

14

are ultimately responsible for furnishing such equipment to polling places, O.C.G.A. § 21-2-70(4).

   B. Plaintiff's claims are barred by the Eleventh Amendment.

As in the *Pearson* case which this Court dismissed, Plaintiff here alleges that the State Defendants exceeded the authority provided delegated to them by the General Assembly. But the Eleventh Amendment bars such suits to determine state law. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). While *Ex Parte Young* provides for an exception to Eleventh Amendment immunity, it does so only for prospective injunctive relief grounded in a violation of *federal* law. *See Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 105–106 (1984). In other words, "the *Young* doctrine rests on the need to promote the vindication of *federal* rights," and is "inapplicable in a suit against state officials on the basis of *state* law." *Id.* at 105–106 (emphasis added). Here, Plaintiff nominally alleges a federal right, but he has not indicated how the state law actually burdens any such right. Judge Jones's order denying a preliminary injunction in *Fair Fight v. Raffensperger* is instructive.[8]

There, Plaintiffs alleged a host of election practices cost Ms. Abrams the election. As here, the Fair Fight plaintiffs raised state law claims that

---

[8] The slip opinion is attached as Exhibit C.

15

were masquerading as constitutional claims. Consequently, and citing the

Eleventh Amendment, Judge Jones found the arguments unpersuasive.

> The Eleventh Amendment states in relevant part: "[t]he Judicial
> power of the United States shall not be construed to extend to
> any suit in law or equity, commenced or prosecuted against one of
> the United States by Citizens of another State . . . ." U.S. Const.
> amend. XI. The United States Supreme Court has held that "a
> suit against state officials on the basis of state law contravenes
> the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v.*
> *Halderman*, 465 U.S. 89, 117 (1984). The Court also indicated
> that when injunctive relief is  sought, "an error of law by state
> officers acting in their official capacities will not suffice to
> override the sovereign immunity of the State where the relief
> effectively is against it." *Id*. at 113 (citations omitted). The Court
> further stated: "it is difficult to think of a greater intrusion on
> state sovereignty than when a federal court instructs state
> officials on how to conform their conduct to state law." *Id*. at 106

Ex. C at 13-14.  Applying this rule, the *Fair Fight* court decided that the

"gravamen" of the plaintiffs' claims rested on the idea that the Secretary

improperly interpreted and "failed to adhere" to state law. *Id*. at 15.

Consequently, "the Eleventh Amendment bar[red] Plaintiffs' motion to the

extent that it require[d] a conclusion by this Court that Plaintiffs'

interpretation of HB 316 is correct."  *Id*. at 15-16. The same is true here,

where Plaintiff's claims require a conclusion on State law first.

16

C. The prior pending action doctrine and the doctrine of laches bar Plaintiff's claims.

Federal courts recognize the prior pending action defense, which precludes a plaintiff from (1) filing two lawsuits; (2) against the same parties; (3) that allege "substantially identical claims" while one remains pending. *McColligan v. Vendor Res. Mgmt.*, 5:18-CV-160 (MTT), 2019 WL 1051188, at *3 (M.D. Ga. Mar. 5, 2019) (citing *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985)); *see also United States v. Haytian Rep.*, 154 U.S. 118, 125 (1894) ("party seeking to enforce a claim legally or equitably must present to the court . . . all the grounds upon which he expects a judgment in his favor. He is not at liberty to split up his demand, and prosecute by piecemeal, or present only a portion of the grounds upon which special relief is sought, and leave the rest to be presented in a second suit, if the first fail"). Applied here, Wood cannot raise the same claims he did in the case dismissed by Judge Grimberg, and upheld by the Eleventh Circuit.

On November 3, 2020, the Plaintiff here sued the State Defendants in this Court, involving the same Plaintiff and two of the same claims here (Equal Protection and Due Process). *Wood I* and *II*. Judge Grimberg described part of Plaintiff's claim as being one alleging "that Defendants violated the Constitution by (1) executing and enforcing the Settlement

17

Agreement to the extent it requires different procedures than the Georgia Election Code." *Wood I* at *4. The same is undeniably true here. [Doc. 1, ¶¶ 9, 11–26, 72–93]. Judge Grimberg dismissed the complaint in *Wood I*, the Eleventh Circuit affirmed.

Plaintiff's claims regarding the Settlement Agreement/OEB, scanning of absentee ballots, drop boxes, and the BMD voting system are also barred by laches, as this Court found in a related case and Judge Grimberg decided in Plaintiff's claim before him. It is not even a close call. When Plaintiff first brought his challenge, Judge Grimberg held that all four elements of laches were satisfied: "(1) there was a delay in asserting a right or a claim, (2) the delay was not excusable, and (3) the delay caused [them] undue prejudice." *Wood I* at *7 (citing *United States v. Barfield*, 396 F.3d 1144, 1150 (11th Cir. 2005)). After all, the challenged settlement agreement was in March 2020; it was approved in open court, and nothing prevented the Plaintiff from challenging anytime during the prior eight months. *Id.* The State Election Board rules concerning absentee drop boxes and scanning of ballots have similarly been in place since July 1, 2020. As held in *Wood I*: the plaintiff "could have, and should have, filed his constitutional challenge much sooner than he did, and certainly not two weeks *after* the General Election." *Id.* (emphasis added).

This Court concluded the same in *Pearson*'s challenge to the Dominion machines: "There is no reason [plaintiffs] could not have followed the Administrative Procedure Act and objected to the rule-making authority that had been exercised by the Secretary of State. This suit could have been filed months ago at the time the machines were adopted." *See* Ex B, Tr. at 43. This case presents the same facts and the same analysis.

   D. Plaintiff's Guarantee Clause claim presents a non-justiciable political question and must be dismissed.

   Plaintiff's allege a claim under the Guarantee Clause of the United States Constitution, U.S. Const. Art 1, Sec. 4, the Supreme Court of the United States "has several times concluded, however, that the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019). Indeed, a long line of Supreme Court precedent has noted that claims under this provision are generally non-justiciable political questions. *See, e.g.*, *Baker v. Carr*, 82 S. Ct. 691 (1962); *Pac. States Tel. & Tel. Co. v. State of Oregon*, 223 U.S. 118 (1912); *Luther v. Borden*. 48 U.S. 1 (1849). And, of course, political questions are not within the province of the federal judiciary. *See McMahon v. Pres. Airways, Inc.*, 502 F.3d 1331, 1357 (11th Cir. 2007) (citing *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170 (1803)).

19

While Plaintiff suggests some claims under the Guarantee Clause could be considered on the merits as alluded to in *New York v. United States*, 505 U.S. 144, 183–84 (1992), Plaintiff cites no case where the Court has actually done so. Nor has the Supreme Court provided—in the nearly thirty years since *New York* was decided—any further guidance on the circumstances in which such a case could be considered on the merits. Instead, just last year the Court reaffirmed the Guarantee Clause does not provide the basis for a justiciable claim. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2494 (2019).

E.  <u>Even if Plaintiff's claims are not otherwise barred, Plaintiff has failed to state a claim for which relief can be granted and has not perfected service of process.</u>

Plaintiff seeks adjudication of numerous state-law issues without stating a claim this Court can address. As a preliminary matter, to the extent the alleged state statutory violations do not amount to vindication of a federal right, they fall outside *Ex Parte Young* and must be dismissed. *See, supra,* Section I.B. And in any event, the allegations are not sufficiently pled and must be dismissed under Federal Rule of Civil Procedure 12(b)(6). Separately, Plaintiff has still failed to perfect service of process, providing another reason to dismiss Plaintiff's Complaint.

Plaintiff's apparent state law claims do not meet the basic requirements of pleading under Federal Rule of Civil Procedure 8. The

20

conclusory enumeration of various statutes does not amount to a short and plain statement showing the pleader is entitled to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Instead, they amount to only "'naked assertions' devoid of 'further factual enhancement.'" *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). But even the minimal factual enhancement that is provided is not plausible as binding precedent requires. *Iqbal*, 556 U.S. at 678. Just as in *Iqbal*, however, Plaintiff's Complaint "has not 'nudged [his] claims' of invidious discrimination 'across the line from conceivable to plausible.'" *Id.* at 680 (quoting *Twombly*, 556 U.S. at 570). Except here, Plaintiff cannot even muster a formulaic recitation of the elements of the claims he seeks—providing only bizarre conspiracy theories and complaining on the basis of *State* law. Consequently, and for the same reasons Plaintiff's claims fail on the merits, *infra*, Plaintiff has failed to state a claim.[9]

---

[9] Nor has Plaintiff complied with Rule 4 and perfected service of process, necessitating dismissal under Rule 12(b)(5). While often failure to secure service will be curable, the facts here demonstrate no reason to provide such leniency. Mr. Wood has been practicing law for a sufficient period of time to know the requirements of Rule 4. And this failure does not come in isolation, Wood also has refused to operate under any typical standard of practice filing repetitive suits with nonsensically redacted and inapposite affidavits.

## II. Plaintiff's Motion for preliminary injunctive relief must be denied

Because "a preliminary injunction is 'an extraordinary remedy [it] is never awarded as of right.'" *Benisek v. Lamone*, ___ U.S. ___, 138 S. Ct. 1942, 1943–44 (2018) (citation omitted).  To obtain relief, Plaintiff must "*clearly establish* the 'burden of persuasion' as to the four requisites of a preliminary injunction." *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998) (emphasis added) (citation omitted). Plaintiff therefore must clearly establish: (1) a substantial likelihood of success on the merits; (2) irreparable injury absent issuance of the injunction; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. *Id.*[10] The extraordinary nature of the relief sought by Plaintiff is heightened in the context of elections, because of the public interest in orderly elections and the integrity of the election process. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). Plaintiff cannot meet his heavy burden.

---

[10] Plaintiff suggests, much like Plaintiffs in *Pearson* suggested in reply, that this Court should employ some amorphous burden shifting regime. [Doc. 2 at ¶ 4]. However, the authority relied on by Plaintiff in this regard is limited to the context of Title VII claims under the Civil Right Act. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Plaintiff does not allege such a claim and offers no authority for this Court to disregard Eleventh Circuit and Supreme Court precedent that places the burden to obtain interlocutory relief in this context squarely upon the movant.

22

A. <u>Even if Plaintiff's claims are properly before this Court, they are not likely to succeed on the merits.</u>

In addition to the jurisdictional bars to Plaintiff's claims discussed in Section I, *supra*, which preclude any possibility that Plaintiff can demonstrate a likelihood of success on the merits, Plaintiff has failed to state a claim for which relief can be granted and cannot show a likelihood of success on the merits.[11] Plaintiff alleges that the challenged practices violate equal protection under the 14th Amendment (Count I), procedural and substantive due process under the 14th Amendment (Count II), and the Guarantee Clause of the United States Constitution (Count III).

    i. *Equal Protection (Count I)*

Plaintiff asserts that he need not allege discriminatory intent to show a likelihood of success on his equal protection claim, [Doc. 2, ¶ 26], and this is true where a plaintiff asserts a corresponding burden on their fundamental right to vote, but where no such burden is alleged (as here), discriminatory intent is required. *Democratic Exec. Comm. v. Lee*, 915 F.3d 1312, 1319 & n.9 (11th Cir. 2019) (distinguishing between traditional equal protection claims

---

[11] In the interest of efficiency—particularly in a case like this one where this Court has already seen these exact same claims within only a few weeks— State Defendants offer this consolidated brief in support of their motion to dismiss and in opposition to Plaintiff's motion for preliminary injunction. For the same reasons Plaintiff cannot demonstrate a likelihood of success on the merits, Plaintiff has also failed to state a claim.

in the voting rights context and such claims burdening the right to vote). Consequently, Plaintiff's equal protection claim is due to be dismissed and Plaintiff cannot show a likelihood of success on the merits.

Alternatively, Plaintiff here presents this claim under either the theories of disparate treatment or vote dilution. In pursuit of the former, "[a] rational[] basis standard of review applies if the plaintiff alleges 'that a state treated him or her differently than similarly situated voters, without a corresponding burden on the right to vote.'" *Wood I* at *8 (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 429 (6th Cir. 2012)). As discussed, Plaintiff has failed to allege a burden on *his* right to vote here and the rational basis standard is "highly deferential" requiring only "*any reasonably conceivable state of facts* that could provide a rational basis for the statute." *Williams v. Pryor*, 240 F.3d 944, 948 (2001) (citation omitted) (emphasis in original). Here, the State maintains a strong interest in the orderly and efficient conduct of the election sufficient to meet this burden. *See New Ga. Project,* 976 F.3d at 1282.

With respect to vote dilution, Plaintiff's claims simply do not fit within this framework, as the *Wood* Court recognized. *Wood I* at *9 ("This theory has been squarely rejected.") (citing *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 354 (3d Cir. 2020)). And, accepting Plaintiff's theory to the

24

contrary, would "transform every violation of state election law (and, actually, every violation of every law) into a potential federal equal-protection claim requiring scrutiny of the government's 'interest' in failing to do more to stop the illegal activity." *Bognet*, 980 F.3d at 355.

ii. *Due Process (Count II)*

Plaintiff also contends the same practices violate both procedural and substantive due process. Regarding procedural due process, such claims in the election context are evaluated under the *Anderson-Burdick* framework which "weigh[s] the 'character and magnitude of the burden the State's rule imposes" on the right to vote "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1280 (11th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). But, as previously noted, Plaintiff has not identified how his fundamental right is burden—the first, essential step under *Anderson-Burdick*. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) (Scalia, J., concurring).

As to substantive due process, such claims in the context of voting are limited to a narrow sphere wherein patent fundamental unfairness can be demonstrated. *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir. 1986). Indeed,

the Eleventh Circuit has implored courts "must take seriously the Supreme Court's caution against expanding the concept of substantive due process." *Waddell v. Hendry Cty. Sheriff's Office*, 329 F.3d 1300, 1304–05 (11th Cir. 2003) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, (1992)). The practices challenged, even as pleaded by Plaintiff, do not amount to fundamental unfairness sufficient to show a substantive due process violation. Wood's complaints are instead "garden variety" election disputes that do not rise to the level of constitutional deprivation. *Id.* at \*12 (citing *Curry*, 802 F.2d at 1314–15). But even if it were, Wood could not have suffered (and will not suffer) any such deprivation as to the absentee practices since he alleges *he did not and will not vote absentee-by-mail.*

iii. *Guarantee Clause (Count III)*

Finally, Plaintiff must meet a high threshold in showing his claim under the Guarantee Clause is even justiciable. The only authority cited by Plaintiff in support of this claim does not actually "resolve this difficult question," but only speculates some form of such a claim under the provision may be cognizable. *New York v. United States*, 505 U.S. 144, 183–84 (1992). In any event, the Guarantee Clause, by its own text, provides:

> The United States shall guarantee *to every State* in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the

26

> Executive (when the Legislature cannot be convened) against domestic Violence.

U.S. Const Art. I, Sec. 4 (emphasis added). Consequently, the text of the Clause affords constitutional consideration between only the states and the federal government, promising "each *state* a government based on popular control . . . No *state* may establish a monarchy, dictatorship, or any other form of government inconsistent with popular representation." Deborah Jones Merritt, *The Guarantee Clause and State Autonomy: Federalism for a Third Century*, 88 Colum. L. Rev. 1, 25–26 (1988) (citing The Federalist No. 43 at 291 (J. Madison) (J. Cooke ed. 1961)). Indeed, "[i]n light of the Guarantee Clause's implicit protection of state governmental processes from the tyranny of an all-powerful federal sovereign, it would seem imprudent on the part of the federal judiciary to allow the Clause to be used to challenge a state's own lawmaking." *Schulz v. New York*, 2019 WL 3975670, at *5 (N.D.N.Y. Aug. 22, 2019), *aff'd sub nom. Futia v. New York*, 2020 WL 6879005 (2d Cir. Nov. 24, 2020).

B. <u>Plaintiff has failed to show irreparable harm.</u>

Plaintiff's motion offers very little substance to demonstrate irreparable harm, instead it simply assumes harm exists, devoting one paragraph to the topic. [Doc. 2 at ¶ 43]. Plaintiff obliquely asserts that absent

27

an injunction, his fundamental right to vote will be infringed and that the results of the election absent an injunction would be improper. As to the former, Plaintiff's actual claims do not even allege *how* the *Plaintiff's* right to vote will be infringed. At minimum, Plaintiff's allegation that he intends to vote in person, [Doc. 1, ¶ 3], forecloses his ability to show irreparable harm absent an injunction regarding the signature verification process, processing of absentee ballots, and drop boxes since even he admits he will not be subject to any such process. And Plaintiff cannot assert standing (much less irreparable harm) in the outcome of the election because "[v]oters have no judicially enforceable interest in the outcome of an election." *Jacobson*, 974 F.3d at 1246.

Even assuming these vague allegations amount to a showing of irreparable harm absent an injunction, it does nothing to show irreparable harm absent an injunction issued against *the State Defendants*. As discussed, only an injunction against Plaintiffs' counties of residence could *potentially* remedy anything. *See Id.* In any event, Plaintiffs offer little to show that their requested relief will remedy anything—it is hard to imagine how halting the ongoing voting for the Runoff Elections, [Doc. 2, ¶ 43], would provide any remedy to Plaintiff's nebulous allegations. He therefore cannot show irreparable harm absent the injunction requested.

28

C. <u>The balance of the equities and public interest weighs decidedly against granting injunctive relief.</u>

Plaintiff claims Defendants have usurped that which is delegated to the Georgia legislature, but in the same breath asks the court to do the very same thing by postponing the election. The balance of equities and public interest factors, however, weigh in favor of the Defendants and against injunctive relief. In elections cases, both factors are generally considered together. *See Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018).

In addition, "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). Court orders that impact elections can undermine that confidence and "result in voter confusion and consequent incentive to remain away from the polls." *Id.* at 4–5. The risk of such confusion increases as an election draws closer. *Id.* Indeed, courts must consider the "imminence of the election" and should not "alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S.Ct. 1205, 1207 (April 6, 2020) (per curiam); *see also New Ga. Project*, 976 F.3d at 1283 (11th Cir. 2020).

Here, the runoff election is already well underway. Election day itself is in less than two weeks. Absentee ballots have been mailed and many have

29

been returned. Alterations to elections procedures at this point in the election and this close to election day will result in voter confusion and needlessly undermine the processes already in place. This includes usage of drop boxes for submitting absentee ballots, procedures related to absentee ballot signatures, and use of the BMDs. Given the presence of all these policies over the last two elections, their sudden elimination will sow confusion.

Moreover, Mr. Wood's requested relief would do precisely what he has complained of previously—substituting a federal court's determination on the time place and manner of elections for that of the State. Given the specific direction in the Constitution and discretion allowed to states, courts have long been reticent to encroach on the state's chosen election system absent severe circumstances that are not present here. *See*, *e.g.*, *Griffin v. Burns*, 570 F.2d 1065, 1077-78 (1st Cir. 1978) At its worst. Wood's requested relief would leave at least one Georgia Senate seat unfilled for an indeterminate period of time following the end of the current term.

## CONCLUSION

For the reasons stated herein, State Defendants move this Court to dismiss Plaintiff's Complaint or, in the alternative, deny their motion for injunctive relief.

Respectfully submitted, this 23rd day of December 2020.

30

/s/ Carey Miller
Carey A. Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
Robbins Ross Alloy Belinfante Littlefield LLC
500 14th Street, N.W.
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*Special Assistant Attorneys General*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing **DEFENDANTS' CONSOLIDATED BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS AND RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR INJUNCTIVE RELIEF** has been prepared in Century Schoolbook 13 pt., a font and type selection approved by the Court in L.R. 5.1(B).

/s/ Carey Miller
Carey A. Miller