IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| L. LIN WOOD, JR.,<br><br>Plaintiff,<br><br>v.<br><br>BRAD RAFFENSPERGER, REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE,<br><br>Defendants,<br><br>and<br><br>DEMOCRATIC PARTY OF GEORGIA, INC. and DSCC,<br><br>Intervenor-Defendants. | CIVIL ACTION FILE<br><br>NO. 1:20-cv-5155-TCB |

**O R D E R**

This case comes before the Court on Plaintiff L. Lin Wood, Jr.'s motion for a temporary restraining order ("TRO").

## I. Background

This is the latest in a series of cases associated with Wood that seek to challenge aspects of the 2020 election cycle.

Wood is a registered voter in Fulton County who plans to vote in the January 5, 2021 runoff election in-person.[1] He seeks to prevent the runoff from proceeding, arguing that "Defendants are conducting it in a 'Manner' that differs from and conflicts with the election scheme established by the State Legislature." [1] ¶ 9. He contends that three aspects of Defendants' election scheme unconstitutionally contravene the Georgia legislature's prescribed election procedures:

1. signature verification for absentee ballots;[2]
2. processing of absentee ballots prior to January 5;[3] and
3. installation of ballot drop boxes.[4]

---

[1] Wood swears in his amended verification that his averments are true and correct, [5-1] at 1, and the Court will presume the veracity of his statements for purposes of this motion.

[2] Pursuant to a March 6, 2020 settlement agreement, a signature-matching bulletin issued by Defendants requires two-person review of any allegedly mismatched signatures on absentee ballots.

[3] State Election Board ("SEB") Rule 183-1-14-0.9-.15, the "Ballot Processing Rule," permits the processing—*but not tabulation*—of ballots prior to the runoff.

[4] SEB Rule 183-1-14-0.8-.14, the "Drop Box Rule," permits the use of ballot drop boxes for voters to mail absentee ballots.

2

Wood argues that the election board's promulgation of these rules—together with the use of Dominion voting machines—violates his rights to equal protection (Count I), due process (Count II), and a republican form of government (Count III).

In his motion for a TRO, Wood seeks the following emergency relief:

1. a declaration that Defendants' senatorial runoff election procedures violate his rights to due process, equal protection, and the guarantee of a republican form of government;
2. a preliminary and permanent injunction prohibiting Defendants' election procedures in the runoff;
3. an order requiring Defendants to "cure their violation"; and
4. an order that Wood have access to absentee ballot mail-in envelopes received and/or processed thus far and access to view and verify the signatures against those on file.

[2] at 29–30.

Subsequent to Wood's motion for a TRO, the Democratic Party of Georgia and the DSCC moved [13] to intervene as Defendants and dismiss this action. This Court granted [14] the motion to intervene and directed the Clerk to docket the intervenor-Defendants' motion [16] to dismiss.

3

The state Defendants also moved [26] to dismiss the complaint. They, like the intervenor-Defendants, contend that this Court lacks jurisdiction to hear this case and that Wood fails to state a claim for relief. Both the intervenor-Defendants and the state Defendants also responded [24, 25] in opposition to Wood's motion for a TRO. Wood later replied [33].

For the following reasons, Wood lacks standing to pursue his claims. Accordingly, the Court need not reach the merits of Wood's TRO argument, and this case will be dismissed.

## II. Legal Standard

The standards for issuing a temporary restraining order and a preliminary injunction are identical. *Windsor v. United States*, 379 F. App'x 912, 916–17 (11th Cir. 2010). To obtain either, Wood must demonstrate that (1) his claims have a substantial likelihood of success on the merits; (2) he will suffer irreparable harm in the absence of an injunction; (3) the harm he will suffer in the absence of an injunction would exceed the harm suffered by Defendants if the injunction is issued; and (4) an injunction would not disserve the public interest.

*Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1246–47 (11th Cir. 2002). The likelihood of success on the merits is generally considered the most important of the four factors. *Garcia-Mir v. Meese*, 781 F.2d 1450, 1453 (11th Cir. 1986).

A preliminary injunction "is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion as to each of the four prerequisites." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000).

### III. Discussion

Article III of the Constitution restricts federal courts' jurisdiction to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. "The purpose of the standing requirement is to ensure that the parties have 'such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions.'" *McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).

Wood must have standing "for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017).

Standing requires Wood to show "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)).

The injury-in-fact component requires "an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020) (internal quotation omitted).

Thus, the injury must "affect [Wood] in a personal and individual way." *Lujan*, 504 U.S. at 561 n.1. Claims that are "plainly undifferentiated and common to all members of the public" are generalized grievances that do not confer standing. *Lance v. Coffman*, 549 U.S. 437, 441–42 (2007) (internal citation omitted).

And where, as here, a plaintiff seeks prospective relief to prevent a future injury, the plaintiff must also demonstrate that the future injury is "certainly impending." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks and citation omitted); *see also Indep. Party of Fla. v. Sec'y of the State of Fla.*, 967 F.3d 1277, 1280 (11th Cir. 2020). A "possible future injury" does not confer standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

### A.  Standing Under the Equal Protection Clause[5]

Throughout much of his complaint, Wood repeats that he suffered an injury from Defendants' purported violations of Georgia law.

---

[5] Though the Court will dismiss Wood's claims for lack of standing, his equal protection claim is also barred in part by the doctrine of collateral estoppel because this Court and the Eleventh Circuit recently concluded that Wood lacked standing to bring almost identical equal protection claims. *See Wood v. Raffensperger et al.*, No. 1:20-cv-4651-SDG, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020), *aff'd*, No. 20-14418, 2020 WL 7094866, at *1 (11th Cir. Dec. 5, 2020). And while

> dismissal of a complaint for lack of jurisdiction does not adjudicate on the merits so as to make the case res judicata on the substance of the asserted claim, it does adjudicate the court's jurisdiction, and a second complaint cannot command a second consideration of the same jurisdictional claims.

*N. Ga. Elec. Membership Corp. v. City of Calhoun*, 989 F.2d 429, 433 (11th Cir. 1993).

7

However, as this Court has previously pointed out *to Wood*, "[c]laims premised on allegations that 'the law . . . has not been followed . . . [are] precisely the kind of undifferentiated, generalized grievance about the conduct of government . . . [and] quite different from the sorts of injuries alleged by plaintiffs in voting rights cases where we have found standing.'" *Wood*, 2020 WL 6817513, at *14–15 (quoting *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1332–33 (11th Cir. 2007)) (alterations in original); *see also Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 355 (3d Cir. 2020) (citing *Shipley v. Chi. Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("Violation of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim.")); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992) ("[R]aising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy.").

In an attempt to show a particularized injury for purposes of his equal protection claim, Wood alleges that he has standing as a "holder of the fundamental right to vote" because voters have "a legally cognizable interest in preventing 'dilution' of their vote through improper means." [2] ¶ 10 (quoting *Baker v. Reg'l High Sch. Dist. No. 5*, 520 F.2d 799, 800 n.6 (2d Cir. 1975)).

It is true that vote dilution can be a basis for standing. *See United States v. Hays*, 515 U.S. 737, 744–45 (1995) ("Where a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment because of the legislature's reliance on racial criteria.").

However, "vote dilution under the Equal Protection Clause is concerned with votes being *weighed differently*." *Bognet*, 980 F.3d at 360 (emphasis added) (citing *Rucho v. Common Cause*, __ U.S. __, 139 S. Ct. 2484, 2501 (2019) ("'[V]ote dilution' in the one-person, one-vote cases refers to the idea that each vote must carry equal weight.")).

Courts have consistently found that a plaintiff lacks standing where he claims that his vote will be diluted by unlawful or invalid ballots. *See Moore v. Circosta*, Nos. 1:20cv911, 1:20cv912, __ F. Supp. 3d

9

\_\_, 2020 WL 6063332, at *14 (M.D.N.C. Oct. 14, 2020) ("[T]he notion that a single person's vote will be less valuable as a result of unlawful or invalid ballots being cast is not a concrete and particularized injury in fact necessary for Article III standing."); *Donald Trump for President, Inc. v. Cegavske*, No. 2:20-cv-1445 JCM (VCF), \_\_ F. Supp. 3d \_\_, 2020 WL 5626974, at *4 (D. Nev. Sept. 18, 2020) ("[P]laintiffs' claims of a substantial risk of vote dilution 'amount to general grievances that cannot support a finding of particularized injury . . . .'"); *Martel v. Condos*, No. 5:20-cv-131, \_\_ F. Supp. 3d \_\_, 2020 WL 5755289, at *4 (D. Vt. Sept. 16, 2020) (rejecting vote-dilution theory as conferring standing because it constituted a generalized grievance); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926–27 (D. Nev. 2020) (pointing out that because "ostensible election fraud may conceivably be raised by any Nevada voter," the plaintiffs' "purported injury of having their votes diluted" does not "state a concrete and particularized injury"); *Am. Civil Rights Union v. Martinez-Rivera*, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015).

This is because unlawful or invalid ballots dilute the lawful vote of *every* Georgia citizen. *See Bognet,* 980 F.3d at 356 ("'A vote cast by fraud

or mailed in by the wrong person through mistake,' or otherwise counted illegally, 'has a mathematical impact on the final tally and thus on the proportional effect of every vote, but no single voter is specifically disadvantaged.'" (quoting *Martel*, 2020 WL 5755289, at *4)). And where a plaintiff cannot show a "threatened concrete interest of his own," there is no Article III case or controversy. *Lujan*, 504 U.S. at 573.

Accordingly, Wood's allegation of vote dilution does not demonstrate that he has standing to bring an equal protection claim.

Wood also appears to contend that he will be injured as a member of a class of in-person voters suffering from disparate treatment.

To demonstrate standing based upon a theory of disparate treatment, Wood must show that "a vote cast by a voter in the so-called 'favored' group counts . . . more than the same vote cast by the 'disfavored' group." *Bognet*, 980 F.3d at 359. He fails to do so.

First, Wood has not shown the existence of a favored or preferred class of voters. Georgia law permits all eligible voters to *choose* whether to cast an absentee ballot, without reason or explanation. O.C.G.A. § 21-2-380(b). And "[a]n equal protection claim will not lie by 'conflating all

11

persons not injured into a preferred class receiving better treatment.'" *Bognet*, 980 F.3d at 360 (quoting *Thornton v. City of St. Helens*, 425 F.3d 1158, 1167 (9th Cir. 2005)). Instead, the "relevant prerequisite is unlawful discrimination, not whether the plaintiff is part of a victimized class." *Id.* (citing *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996)).

Wood does not show that he suffered from discrimination or other harm as a result of his classification as an in-person voter. The fact that the process for voting by absentee ballot is different from voting in-person does not establish an injury in fact. Courts have sanctioned the use of distinct voting processes for absentee and in-person ballots, acknowledging that "[a]bsentee voting is a fundamentally different process from in-person voting, and is governed by procedures entirely distinct." *Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1320 (10th Cir. 2008).

And to the extent Wood argues that he will be harmed if his in-person vote counts less as a result of an illegally-cast absentee ballot, the Court reminds him that "a plaintiff lacks standing to complain

about his inability to commit crimes because no one has a right to commit a crime." *Bognet,* 980 F.3d at 362 (quoting *Citizen Ctr. v. Gessler*, 770 F.3d 900, 910 (10th Cir. 2014)). Accordingly, his theory of disparate treatment does not demonstrate that he suffered an injury in fact.

Even if Wood could demonstrate a particularized injury through either his theory of vote dilution or disparate treatment, his claims are far too conclusive and speculative to satisfy Article III's "concreteness" requirement.

As previously noted, sufficiently pleading a non-speculative future injury requires Wood to show either that the threatened injury is "certainly impending" or that there is a "'substantial risk' that the harm will occur." *Susan B. Anthony List*, 573 U.S. at 158 (citing *Clapper*, 568 U.S. at 414 n.5). Allegations that harm is certainly impending or substantially likely must be "based on well-pleaded facts" because courts "do not credit bald assertions that rest on mere supposition." *Bognet*, 980 F.3d at 362 (citing *Finkelman v. NFL*, 810 F.3d 187, 201–02 (3d Cir. 2016)).

13

Here, Wood presumes that a chain of events—including the manipulation of signature-comparison procedures, abuse of ballot drop boxes, intentional mishandling of absentee ballots, and exploitation of Dominion's voting machines—will occur.

However, even taking his statements as true, Wood's allegations show only the "'possibility of future injury' based on a series of events—which falls short of the requirement to establish a concrete injury." *Donald J. Trump for President, Inc. v. Boockvar*, __ F. Supp. 3d __, 2020 WL 5997680, at *33 (W.D. Pa. Oct. 10, 2020) (rejecting a theory of future harm where "th[e] increased susceptibility to fraud and ballot destruction . . . [is] based solely on a chain of unknown events that may never come to pass"); *see also Clapper*, 568 U.S. at 409 (concluding that "allegations of *possible* future injury are not sufficient").

Wood attempts to show that fraud is certain to occur during the runoff by arguing that the November 3 general election was rife with fraud. However, even if that were the case, the alleged presence of harm during the general election does not increase the likelihood of harm during the runoff. *See Boockvar*, 2020 WL 5997680, at *33 ("It is

14

difficult—and ultimately speculative—to predict future injury from evidence of past injury.").

And claims of election fraud are especially speculative where they rely upon the future activity of independent actors. *See id*. at *33 (rejecting as speculative claims "that unknown individuals will utilize drop boxes to commit fraud . . . [and] for signature comparison, that fraudsters will submit forged ballots by mail") (citing *Clapper*, 568 U.S. at 414 (declining to "endorse standing theories that rest on speculation about the decisions of independent actors")). This is even more so the case where a plaintiff speculates that an "independent actor[] [will] make decisions to act *unlawfully*." *Bognet,* 980 F.3d at 362 (citing *City of L.A. v. Lyons*, 461 U.S. 95, 105–06 (1983)).

Here, Wood's theory of harm rests on speculation about the future illegal activity of independent actors. He alleges that use of ballot drop boxes "*produces opportunities* for political activists to submit fraudulent absentee ballots," [1] ¶ 50 (emphasis added); that enhanced signature review would "*ma[k]e it more likely* that ballots without matching signatures would be counted," *id*. ¶ 24 (emphasis added); and that

15

permitting the processing of absentee ballots prior to January 5 will facilitate the counting of "fraudulent mail-in ballots . . . cast in the[] name" of would-be in-person voters," *id.* ¶ 32. These allegations plainly contemplate only the *possibility* of future harm and do not conclusively demonstrate a future injury.

Wood's claims regarding ongoing "systemic fraud" through use of the Dominion voting machines fare no better. He hazards that "there is actual harm imminent to [him]" because "Dominion w[as] founded by foreign oligarchs and dictators . . . to make sure [that] Venezuelan dictator Hugo Chavez never lost another election." *Id.* ¶ 63.

Not only is this allegation astonishingly speculative, but it also presumes that because independent bad actors allegedly fixed the election of a now-deceased Venezuelan president, fraud will recur during Georgia's runoff. Again, past harm does not sufficiently show a risk of future harm to confer standing. *Boockvar*, 2020 WL 5997680, at *33. Even if Wood's alleged fraudulent events were to ultimately occur, he has not shown more than a *possible* future injury. This is insufficient to confer standing. *See id.* at *35.

16

Thus, Wood's claims are both too generalized and too speculative to demonstrate an injury in fact. Accordingly, he lacks standing to pursue his equal protection claim, and Count I will be dismissed.[6]

**B.     Standing Under the Due Process Clause**

Although Wood does not argue in his motion for a TRO that he has standing to pursue his due process claim, he contends that Defendants' failure to act in a manner consistent with the Georgia Election Code and use of the Dominion machines "render the election procedures for the runoff so defective and unlawful as to constitute a violation of [his] right to procedural due process." [2] ¶ 80. He also argues that his substantive due process rights will be violated because Defendants'

---

[6] Although it need not reach the separate elements of traceability and redressability, the Court also points out that standing requires that any injury be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party." *Lujan*, 504 U.S. at 560. Wood does not allege that Defendants—the Secretary of State and members of the election board—control the election processes which he seeks to enjoin. Accordingly, his alleged injury is not traceable to them and Defendants cannot provide him any redress. *See Ga. Republican Party Inc. et al. v. Sec'y of State for the State of Ga. et al.*, No. 20-14741, at *6 (11th Cir. Dec. 21, 2020) (affirming dismissal of claims challenging election procedures based on lack of standing where the plaintiffs did not demonstrate either traceability or redressability).

17

implementation of election procedures in violation of state law "reach the point of patent and fundamental unfairness." *Id.* ¶ 81.

However, as noted above, these alleged injuries are paradigmatic generalized grievances unconnected to Wood's individual vote. *See Lance*, 549 U.S. at 440–41; *see also Nolles v. State Comm. for Reorg. of Sch. Dists.*, 524 F.3d 892, 900 (8th Cir. 2008) (concluding that voters lacked standing to pursue substantive due process claim based on alleged violation of right to a free and fair election because they did not demonstrate a particularized injury).

For Wood to demonstrate that he has standing to pursue his due process claims, he would need to show an "individual burden[]" on his right to due process. *Wood*, 2020 WL 7094866, at *14. He fails to do so. Accordingly, he lacks standing to pursue his due process claim and Count II will be dismissed.

### C. Standing Under the Guarantee Clause

Wood also fails to raise the issue of standing under the Guarantee Clause, but in any event, his Guarantee Clause claim is not only nonjusticiable, but he also lacks standing to pursue it.

Article IV, § 4 of the constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government . . . ." U.S. Const. art. IV, § 4.

The Supreme Court has historically held—point blank—that "the Guarantee Clause does not provide the basis for a justiciable claim." *City of Rome v. United States*, 446 U.S. 156, 182 n.17 (1980); *Baker v. Carr*, 369 U.S. at 217–19; *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118, 147–51 (1912); *Luther v. Borden*, 48 U.S. 7 (1849). On this basis alone Wood is barred from asserting a claim under the Guarantee Clause.

More recently, the Supreme Court has expressed some doubt that *all* challenges to the Guarantee Clause are nonjusticiable. *See New York v. United States,* 505 U.S. 144, 185 (1992); *see also Reynolds v. Sims*, 377 U.S. 533, 582 (1964) (concluding that "*some* questions raised under the Guaranty Clause are nonjusticiable") (emphasis added).

However, even if this were one of those elusive justiciable claims, Wood lacks standing to pursue it. "[F]or purposes of the standing inquiry . . . the Guarantee Clause makes the guarantee of a republican

form of government *to the states*; the bare language of the Clause does not directly confer any rights on individuals vis-à-vis the states." *Largess v. Supreme Jud. Ct. for the State of Mass.*, 373 F.3d 219, 224 n.5 (1st Cir. 2004) (per curiam). Accordingly, Count III alleging violation of the Guarantee Clause is due to be dismissed.

## IV. Conclusion

Based on the foregoing, the Court lacks jurisdiction to hear this case. Accordingly, Wood's motions [2, 3] are denied, as is his request for a hearing.[7] The Clerk is directed to close this case.

IT IS SO ORDERED this 28th day of December, 2020.

_____
Timothy C. Batten, Sr.
United States District Judge

---

[7] Though the Court identified December 30, 2020 as the appropriate date, if any, for a hearing, it finds that oral argument is unnecessary under the circumstances for the proper adjudication of this matter.